## COPELAND et al. v. UNITED STATES.
### No. 8316.

Circuit Court of Appeals, Fifth Circuit.
May 20, 1937.

R. B. Giles and Clint W. Hager, both of Atlanta, Ga., for appellants.

Lawrence S. Camp, U. S. Atty., and I. K. Hay, Asst. U. S. Atty., of Atlanta, Ga., for the United States.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

FOSTER, Circuit Judge.

On April 6, 1936, an indictment was returned charging that on the 1st day of July, 1933, and continuing until the date of the return of the indictment, J. T. Copeland, C. H. McBerry, and Morris Goldstein had conspired to violate the internal revenue laws by distilling, possessing, and disposing of intoxicating liquor. Named as parties to the conspiracy, but not charged with the crime, were Max Goldstein, Hugh Wallace, Frank Lovern, Eddie Gravitt, Thurston Broadus, Doyle Middlebrooks, John Wingo, Martin Luther Chambers, James Mathers, Samuel W. Teal, and Frank Maine, and other persons to the grand jurors unknown. The indictment alleged twenty-three overt acts, but it is unnecessary to state them.

Copeland and McBerry were put on trial. The record does not disclose why Morris Goldstein was not tried at that time. At the close of the evidence defendants moved for a directed verdict, which was denied. A verdict of guilty was returned by the jury, upon which sentence of two years imprisonment was imposed on each of the defendants. Error is assigned to the overruling of the motion to direct.

There was evidence tending to show that Copeland was sometimes known as J. T. and McBerry was sometimes known as Peanut. They lived about 200 yards from each other, about 4 miles north of Hampton on the Macon-Atlanta Highway, McBerry operated a filling station and store. Copeland's occupation was not shown. Morris Goldstein was the proprietor of a business in Griffin, Ga., which was called a junk yard. In addition to dealing in junk, he sold sugar, meal, and other articles that could be used in making illegal whisky and also for legitimate purposes. A government agent, Parrish, listened to conversa-

tions over Morris Goldstein's telephone line, which had been tapped, from January 15, 1936, to March, 1936, and made stenographic notes of conversations. Using these notes to refresh his recollection, he testified as follows: He intercepted a call on January 21, 1936, between Morris Goldstein and a person who called himself J. T., in which J. T. placed an order for sugar, meal, malt, and yeast. Shortly after this conversation, he followed Goldstein's truck from Goldstein's place of business to the home of J. T. Copeland. In the truck were a number of sacks. After staying at Copeland's house some time, the truck proceeded to McBerry's filling station, where it stopped for ten minutes. He testified that he could see through some cracks in the side of the truck and that it contained 100-pound sacks of brown sugar. He did not see the truck unloaded either at Copeland's or McBerry's, but afterwards discovered it was empty when it went back to Griffin. There was no explanation by the witness as to how he knew the contents of the bags were brown sugar. He overheard a telephone conversation, on March 6, 1936, between Morris Goldstein and a person calling himself Peanut. An order for sugar, meal, malt, and tin cans was placed for delivery about 4:30 p. m. Parrish went to the home of Copeland about 4:35. Goldstein's truck was standing in the yard and several men were moving around it. Parrish stayed there about twenty minutes and followed the truck a short distance when it left. He did not testify to seeing anything in the truck or whether it was empty or loaded when it left Copeland's place. He intercepted another call, on February 18, 1936, between Goldstein and a person who said he was J. T. An order was placed for sugar, rye, meal, a double heavy 220 barrel and two railroad irons. J. T. also said: "Did Peanut say anything to you about any sugar the other day?" and Goldstein answered: "Yes." Another call had been intercepted on January 24, 1936, between Morris Goldstein and a man who called himself Peanut. Goldstein was asked if Bill brought him any secondhand tins. Goldstein made some reply, which Parrish did not catch, and Peanut said he wanted 325. Over a period of about two and a half months of listening these were the only calls about which testimony was given. Parrish testified he knew the voice of Morris Goldstein, but was not familiar with the voices of Copeland and McBerry. The records of the telephone company were pro-

duced. These showed calls from Hampton to Griffin on January 21, at 3:55 p. m. and on February 18, 1936 at 4:28 p. m. to phone 474 at Griffin, which was Morris Goldstein's junk yard. The government brief states these calls were from Copeland, but the record does not disclose who made them.

On July 12, 1936, shortly after midnight, an unregistered still in Clayton county, Ga., was raided. The still was in operation and Copeland was lying down in the still yard. A government witness testified that he jumped up and ran. Another government witness, Samuel Teal, named in the indictment, testified that Copeland and he went together to the still that was raided; that he had a conversation with Copeland and they were going to the still for the purpose of getting a gallon of liquor; that Copeland was drinking and when they got to the distillery he lay down and went to sleep. This witness also testified that Copeland made inquiry as to how much sugar there was in the box of mash. He was told 8 sacks and replied, "I think that is too much." He further testified that neither Copeland nor he did any work at the still. There was other testimony tending to show at different times Goldstein, Copeland, and McBerry, or two of them, were seen together, but nothing at all to show the subject of their conversations at any time. There was also testimony tending to show that at one time McBerry was riding on the public road, in the vicinity of a still with a man called a liquor hauler.

Both Copeland and McBerry took the stand in their own defense, denied that they had anything to do with any stills, denied that they had been parties to the telephone conversations with Morris Goldstein, above set out, and denied that they were parties to any conspiracy as alleged in the indictment. Copeland admitted he was at the still when it was raided, but said he went there to buy a gallon of whisky and walked away when the officers came. He denied he ran.

The case presents purely a question of fact. Conceding that a conspiracy may be established by circumstantial evidence, the rule is that in order to support a conviction the conclusion to be drawn from circumstantial evidence must exclude every other reasonable hypothesis than that of guilt. Evidence secured by wire tapping is weak at best. Parrish is uncorroborated as to two of the conversations having been held. The evidence as to the telephone

conversations fails to show with any degree of certainty, much less beyond reasonable doubt, that either Copeland or McBerry was a party to those conversations. It can hardly be presumed that sugar and other ingredients for mash purchased in January, February, and March were in fact used for making liquor in July. There was nothing to connect any purchase of such articles with the operation of the still where Copeland was found. The mere presence of Copeland at the still that was raided would not be sufficient to show he was either proprietor of or engaged in operating the still. Had he been interested in the still, it would be a reasonable presumption that when he made inquiry as to the amount of sugar being used, and thought it too much, he would have issued orders to have the sugar content of the mash reduced. The mere inquiry did not tend to show guilt under the indictment. Such evidence as there was tends to show Copeland had no interest in the still other than to buy whisky and this stops short of showing that he got it. There was no evidence tending to show that Copeland had any connection with any other still, that McBerry had any connection with any still at all, or that either of them had possessed or disposed of any liquor.

Considering all the evidence in the light most favorable to the government and unfavorable to defendants, it does nothing but create suspicion. We are constrained to hold there was not sufficient to sustain conviction. It was error to deny the motion of defendants for a directed verdict. Since this conclusion requires a reversal of the judgment, it is unnecessary to consider other assignments of error.

Reversed and remanded.