## MAZUROSKY v. UNITED STATES.[*]
### No. 8809.

Circuit Court of Appeals, Ninth Circuit.
Jan. 11, 1939.

*Rehearing denied Feb. 16, 1939.

Edwin D. Hicks, and Hicks & Adams, all of Portland, Or., for appellant.

Carl C. Donaugh, U. S. Atty., and J. Mason Dillard and Manley Strayer, Assts. U. S. Attys., all of Portland, Or., for appellee.

Before DENMAN, MATHEWS, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

The indictment in this case contains eight counts, the first six of which charged defendant with violation of Section 338 of Title 18, U.S.C.A., and the last two of which charged defendant with violation of Section 88 of said Title.

At the close of the trial, the defendant moved for a directed verdict as to all of the counts of the indictment. The court granted the motion as to counts 1, 2, 3, 5 and 6, and denied the motion as to counts 4, 7 and 8. The jury returned a verdict of guilty as to these three remaining counts. This is an appeal by the defendant from judgment entered thereon.

Certain of the facts in the case relate to more than one of the counts, and we therefore set them out prior to a separate discussion of the separate counts:

During all of the period of time covered by the evidence, the defendant was engaged in the pawnshop and jewelry business in Portland, Oregon. In 1918 or 1919 defendant and one Frank Nelson met each other through a mutual acquaintance, a Dr. Brown, who had an optical store adjoining defendant's place of business. The three visited together and were friendly.

By 1925 Nelson had become an optometrist, and prior to November of that year, he associated himself with Dr. Brown in the carrying on of eye frauds. These eye frauds followed a common, simple scheme: Victims were approached by Nelson and Brown, representing themselves to be eye specialists, and using assumed names. After examination the victims were informed that an eye operation was necessary. A fake operation was performed and a charge averaging about $500 was made.

In November of 1925, Nelson and Brown perpetrated an eye fraud upon one William Wagner. This fraud is not made the subject of any of the counts of the

indictment, but the facts were put in evidence in order to show knowledge on the part of the defendant of the unlawful scheme being practiced by Nelson, and the relationship between Nelson, Brown and defendant. One of the checks given by Wagner in' this transaction was presented at a Vancouver Bank, but payment was refused on account of a supposed irregularity. It was later re-presented. At this time it bore defendant's indorsement. It was again denied payment, the bank in the meantime having learned of the fraud. Wagner's brother came to Portland in an effort to locate the defrauders and twice talked to defendant, explaining the circumstances under which the check was given. The defendant did not deny acquaintance with Nelson and Brown and said something about their being gamblers. The check was never paid. Defendant was given $1,000 by Nelson for having cashed this Wagner check. In 1931 Nelson asked defendant "if it really cost $1,000 to square that check", the defendant replying "you still owe me money". In regard to the Wagner transaction, and also another transaction concerning a man by the name of Belter, which will later be discussed, Nelson testified that he had never discussed with the defendant or in defendant's presence the plan of obtaining checks from these persons.

Between 1929 and 1935, defendant asked Nelson, "How are the suckers, Slats? Are you making any big sales?" It does not appear that any answer was given. Nelson testified that these were the only conversations had with the defendant as to how Nelson made his living. In 1935 the defendant told Nelson that he would have to have more than 10% commission for cashing his checks; that "the checks were getting a little hot".

Turning now to a discussion of the various counts of the indictment, it may be said by way of introduction that the theory of the prosecution is that the defendant's part was merely to cash the checks obtained from the victims, taking a 10% or 15% commission for his services in so doing. No claim is made that he took any part in soliciting or operating upon the victims.

In count 4 it is charged that on or about the 28th day of September, 1935, the defendant, in combination with Frank Faircloth (Frank Nelson) and others, used the United States mails for the purpose of executing a scheme to defraud one H. F. Belter.

The perpetrators of the fraud involved in this count were Frank Nelson (alias Dr. Miles) and one Londergan (alias J. C. Adams). The fake operation was performed on September 12, 1935. For the "operation" Belter gave $300 in cash and his check for $500, postdated September 20, 1935, payable to J. C. Adams, drawn on the First National Bank of Kennewick, Washington. At the time Belter gave the check to Nelson and Londergan, he told them to present it to the bank possibly a week or ten days later, when the check would be honored. This check was forwarded to defendant, and the defendant sent Nelson $400. Nelson testified that "I owed defendant $20.00, and I gave him $50.00 for cashing the check and I told him to keep $30.00 for interest on what I owed him". Defendant deposited the check in his savings account in the Bank of California of Portland, Oregon, with instructions to send it direct to the bank on which it was drawn, and not through the Federal Reserve Bank. Defendant further requested that a "no protest" stamp be placed on the check. Through a mistake of the person in charge of the savings department of the bank, the check was not sent "direct", but was sent to the Federal Reserve Bank of Portland, and by that bank sent to the First National Bank of Kennewick, the drawee bank. Payment was refused because of "uncollected funds". When the check was returned to the Bank of California, the defendant was notified that it had not been paid. He thereupon signed a withdrawal for the full amount of the check, and the bank returned the check to him. Defendant then sent the check through the same bank for collection. The collection slip sent through with the check contained the instructions "Please hold for a few days if necessary", and "Remit in Portland Exchange". There is no direct testimony in the record to the effect that defendant requested these instructions to be placed on the collection slip.

The check this time was sent direct to the First National Bank of Kennewick, but there is no testimony to show that the United States mails were used in this stage of the transaction. Upon receipt of the check, the First National Bank of Kennewick debited the drawer's account and credited the Bank's account in the

same amount, and transmitted through the United States mails to the Bank of California its own draft drawn upon the First National Bank of Portland, to the favor of the Bank of California, in payment of the check. It is this use of the United States mails which is relied upon by the prosecution to support the charge in this count of the indictment against the defendant.

Section 338 of Title 18 U.S.C.A., provides, so far as applicable to the case at bar, as follows:

"Whoever, having devised or intending to devise any scheme or artifice to defraud * * * shall, for the purpose of executing such scheme or artifice or attempting so to do, place, or cause to be placed, any letter * * * in any post office, or station thereof * * * of the United States * * * to be sent or delivered by the post office establishment of the United States * * * or shall knowingly cause to be delivered by mail according to the direction thereon * * * any such letter * * * shall be [guilty] * * *".

■ There are two elements of the crime of using the mails to defraud: (1) a scheme intended to defraud and (2) an actual use of the mails in furtherance thereof. Farmer v. United States, 2 Cir., 1915, 223 F. 903, 907. In order to convict the defendant of using the mails to defraud, there must be evidence from which the jury could properly find that the defendant was a party to the fraudulent scheme.

■ It is conceded that there was a fraudulent scheme devised by Nelson and his associates. Furthermore, it is uncontroverted that the defendant cashed the check received by Nelson and his associates from their victim. Collection of the drafts was essential to the full consummation of the fraud. Spear v. United States, 8 Cir. 1917, 246 F. 250, 251. If it can properly be said that the defendant thus participated with knowledge of the scheme to defraud, he was a party thereto, and as such responsible under the statute.

■ However, in our opinion the evidence fails to support any such finding.

The only evidence in the record suggesting guilty knowledge on the part of the defendant is: That he knew that ten years before Nelson had been engaged in an eye fraud perpetrated upon Wagner; that defendant at that time cashed the check obtained by Nelson from Wagner; that defendant had to pay in excess of $1,000 "to square that check"; that defendant during the years 1929 to 1935 had asked Nelson "How are the suckers, Slats? Are you making any big sales?" and that in 1935 the defendant told Nelson that "the checks were getting a little hot". It is not shown in the record whether this latter statement was made before or after the Belter transaction, which is the subject of the fourth count of the indictment.

That the defendant may have had guilty knowledge rests upon suspicion only, arising from his acquaintance or association with Nelson and Brown. This is not enough to convict. Copeland v. United States, 5 Cir. 1937, 90 F.2d 78, 79.

We have very carefully and critically examined the evidence and have arrived at the conclusion that it does not rise to the dignity of proof that defendant participated with knowledge in the scheme used to defraud in this instance. There is plenty of evidence from which he might have supposed that the checks were given in some shady transaction. They could, as well, have come from gambling or other illegal practices; he may have been what is commonly called a "fence" for these crooks (who by the way were already under jail sentences), yet not be within the crime here charged.

The conviction under count 4 is therefore reversed.

At this time, it should be noted that the defendant objected to the introduction of all evidence relating to the Wagner transaction on the ground of remoteness, but since we are of the opinion that even though it be considered there is not sufficient evidence to connect appellant with the fraudulent scheme, it is unnecessary for us to decide the question of its admissibility. Likewise, in our view of the case it is unnecessary for us to decide whether the mailing by the First National Bank of Kennewick can properly be said to have been a mailing by the defendant.

■ Counts 7 and 8 of the indictment charge conspiracies, under Section 88 of Title 18 U.S.C.A. We will first consider count 8, as the alleged scheme is in part the same as that noted in count 4 of the indictment and above set forth. The conspiracy is alleged to have been formed on or prior to September 12, 1934. The overt acts relied upon are the various acts

in connection with the Belter fraud discussed above, and also acts in connection with another fraud, perpetrated upon one E. C. Deibert. The active operators in this fraud also were Nelson and Londergan. The purported operation was performed about December, 1935 (approximately three months after the Belter fraud) at Rockford, Washington. Deibert gave them $50 cash and a postdated check for $300, payable to the order of J. C. Adams, the fictitious name used by Londergan. Nelson testified that he sent the check to defendant in Portland rather than cashing it at some local bank because he "knew that the checks were to be handled through him [defendant]". The check was sent under the true name of Frank Nelson.

Defendant deposited the check in the Bank of California, Portland, Oregon, and asked that it be sent direct to the drawee bank instead of through the Federal Reserve bank, "for the reason that he wanted quick action, quick returns on the check". He also requested the bank to place a "No protest" stamp on the face of the check. According to the stipulation of counsel in open court, the check was sent through the Federal Reserve Bank. It was further stipulated that it was the custom to send such items by United States mail. Payment was stopped on the check and it was returned to the Bank of California.

Turning now to count 7 of the indictment, this likewise charges a conspiracy to use the mails to defraud, but relates to different fraudulent activities than those set forth in count 8.

The active operators in these fraudulent activities are John M. Gray, T. A. Andrews and Roy Martin. The fraud was similar to that employed by Nelson and his associates, with an additional scheme of selling or renting to the victims a so-called "radium belt".

The overt acts relied upon relate to two separate transactions, namely, the Allen transaction and the Mershon transaction.

On September 12, 1934, Gray, through the use of this fraudulent scheme, obtained a bank draft in the sum of $500 from Clara Allen. He gave the draft to Martin, who told Gray that he was going to send it to defendant for collection, and that it would cost 15% to cash it. The check was sent by Martin to defendant by United States mail, Martin using the assumed name of Terrell. The check was presented by defendant to the U. S. National Bank of Portland for collection with instructions to "send air mail, wire fate, rush." The defendant received the proceeds of the check. Gray subsequently received the $500 less 15% commission and wiring costs.

About a month later, in October, 1934, these parties perpetrated an eye fraud on Christine Mershon, and obtained from her a check in the sum of $450. Gray gave the check to Martin "for him to find someone to cash the check". Martin told Gray that he had mailed the check from Seattle to defendant in Portland. Later Gray and Mrs. Martin went by pre-arrangement to defendant's store in Portland, where they received the proceeds less 15%. Gray could not state positively that it was defendant who delivered the money, but stated that he thought it was.

In connection with this count of the indictment, Gray testified that he had operated in eye frauds between 1930 and 1935; that he first met the defendant in November, 1935, through Martin. There is no showing in the record as to the extent of the acquaintance between defendant and Martin.

Section 88 of Title 18 U.S.C.A. reads, so far as here applicable, as follows:

"If two or more persons conspire * * * to commit any offense against the United States * * * and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined * * *".

The courts have drawn a distinction in the proof of intent necessary in a conspiracy charge and a charge of the substantive offense of using the mails to defraud. Farmer v. United States, supra, 223 F. page 907. Where the charge is conspiracy to use the mails to defraud, in addition to proving a scheme to defraud, it is necessary to show an intent to use the mails to effect the scheme.

It is our opinion that there is no evidence in the record from which it can be found that the defendant had knowledge of the fraudulent schemes at the time he cashed the checks for those actively engaged in the frauds. The most that can be said from the evidence is that the defendant cashed the checks under what may be said to have been suspicious circumstances.

Furthermore, there is no evidence from which it can be found that it was a part of the scheme of those actively engaged in the fraudulent activities that the mails be used. In the absence of proof of these essential elements of the crime charged, the judgment on counts 7 and 8 must also be reversed.