**C. A. DANIEL, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 15758.**

United States Court of Appeals
Fifth Circuit.

May 25, 1956.

Rehearing Denied Aug. 27, 1956.

Lee S. Bane, W. F. Bane, Dallas, Tex., for appellant.

John C. Ford, Asst. U. S. Atty., Dallas, Tex., Heard L. Floore, U. S. Atty., Fort Worth, Tex., for appellee.

Before RIVES, TUTTLE and CAMERON, Circuit Judges.

RIVES, Circuit Judge.

This appeal is taken from an aggregate district court award to appellee of $6,-000.00, which sum represents treble the statutory recovery of $2,000.00 for each of three fraudulent acts found to have been committed by appellant for the purpose of obtaining certain surplus property of the United States to which he was not entitled, in violation of the Surplus Property Act of 1944, as amended. The statute upon which appellee's recovery was based reads as follows:

"(b) Every person who shall use or engage in, or cause to be used or engaged in, or enter into an agreement, combination, or conspiracy to use or engage in or to cause to be used or engaged in, any fraudulent trick, scheme, or device, for the purpose of securing or obtaining, or aiding to secure or obtain, for any person any payment, property, or other benefits from the United States or any Federal agency in connection with the procurement, transfer, or disposition of property under this chapter, * * *

"(1) shall pay to the United States the sum of $2,000 for each such act, and double the amount of any damage which the United States

may have sustained by reason thereof, together with the cost of suit * * *." Title 40 U.S.C.A. § 489(b) (1), formerly Title 50 U.S.C.A.Appendix, § 1635(b).

The testimony reveals that, during 1946, appellant and three veterans, George Reese, William Adair and Albert Axe, all worked for the County of Dallas, Texas; that in the Spring of that year each veteran filed an application with the War Assets Administration office at Fort Worth, Texas, wherein each represented that he wished to purchase a Government surplus truck for use in his own business, rather than for resale; [1] that, upon the basis of such individual representations by the aforenamed veterans, they were issued veterans' priority certificates enabling them to make priority purchases of such equipment; that veteran Reese used his certificate to purchase a two and one-half ton GMC Cargo Truck for $1,185.00 from the War Assets Administration at a sale held in March, 1946, at Camp Livingston, Louisiana, to which sale he was accompanied by appellant and for which purpose appellant provided the money at the sale site; that Reese never intended to buy this truck for his own use, as evidenced by the fact that he immediately delivered possession of said vehicle and subsequently transferred title thereto to appellant.

It was further shown that veteran Adair, by virtue of his having been issued a priority certificate based upon his representation of the need of such vehicle for his own use, became the purchaser of the same type vehicle for the sum of $1,049.00 at a War Assets Administration sale held at Camp Swift, Texas, on May 8, 1946; that on the following day, May 9, 1946, appellant gave Adair a check in this same amount to cover his purchase, whereupon Adair immediately delivered possession of the truck to appellant and subsequently conveyed title to him without ever having used the truck for any purpose of his own, as theretofore represented in his application for a priority certificate to authorize his purchase.

Similarly, the proof reveals that veteran Axe, by virtue of his veterans' priority certificate issued in reliance upon his aforesaid representation was allowed to purchase the same type vehicle at a sale held at Camp Livingston, Louisiana, on March 28, 1946, for the sum of $1,-139.00; that Axe also never used his truck for his own purposes, but on May 9, 1946 was paid $1,139.00 by appellant therefor and delivered the vehicle to him, subsequently transferring title to him also.

The district court, sitting without a jury, stated its credibility findings and

---

1. Like the Trial Court, we attach little significance to the proven fact that the originals of these veterans' applications for priority certificates had been destroyed prior to the trial and pursuant to an Act of Congress authorizing destruction of such Government records, especially in view of testimony by Government agent, Girlinghouse, that the veteran's representation that his proposed purchase of surplus property *for his own use* "normally is in the application". The veteran, Reese, in fact admitted in his testimony that he represented in his application his intention to use the surplus truck in his own business, and the inclusion of such representation by all three veterans in their applications for the priority certificates is not seriously disputed here. Viewed

most favorably to appellant, this is merely a deficiency affecting the cogency of the Government's proof, and one which obviously could not be seriously urged in bar of this action. Further, even in a criminal case, as this Court recently said in Watson v. United States, 224 F.2d 910, 912,

"The use of secondary evidence will * * * be justified * * * if it be shown by competent evidence that the Government or its agents had destroyed the original and primary evidence in its possession without any fraudulent purpose or any intent to create an excuse for its nonproduction. Riggs v. Tayloe, 9 Wheat. 483, 487, 6 L.Ed. 140; 20 Am. Jur., Evidence, Sec. 438; 4 Wigmore on Evidence, 3rd ed., Sec. 1198."

conclusion therefrom in its unreported oral opinion as follows:

"The fact that witnesses testified that the defendant Daniel furnished the money and was working with each of the witnesses, and put up the money to purchase, and in one instance, at least, went with the purchaser when he did purchase, and each of these purchasers were veterans entitled to purchase government property at a lower scale than anyone else could purchase it; under that state of facts I believe that the defendant Daniel knew that these veterans were going to get these certificates and to use them in the purchase of this property. It is almost an insult to one's ability to connect testimony and to discover where the truth lies to make any other conclusion. He put up the money. He got the things that were purchased. He knew they were veterans. And, as I have already said, in at least one instance went with him down there where the sales were made to the veterans.

\* \* \* \* \* \*

"I, therefore, conclude, as a matter of law that judgment must go for the plaintiff."

Appellant's sole insistence is that the above quoted findings and inferences of the court are clearly erroneous, and palpably insufficient to support its judgment on the basis of the charge actually plead.[2] He contends, in effect, that since the record is admittedly devoid of any *direct* testimony showing his complicity in any conspiracy with these veterans to make misrepresentations in their applications for such priority certificates, the court was not authorized to *infer* his involvement as a matter of law from the case made. As supporting this insistence, appellant relies upon partial deficiencies in the proof resulting from the Government's failure or inability to show he supplied the money prior to or at the time of purchase for any veteran other than Reese, and upon other testimony tending to negative his participation in any conspiracy with these veterans *at the time their applications were made,* such as Reese's assertion that he did not then know appellant, Adair's testimony that he never told appellant about making any application or receiving his priority certificate, and the further absence of any direct proof as to his knowledge of an application for priority ever having been made by Axe, the veteran who did not testify at the trial.

The obvious answer to this evidentiary argument, as we understand it, is that the trial court was not bound to accept this testimony, nor to attach credence to Adair's apparent attempt to exonerate appellant,[3] but was justified in its ultimate conclusion of liability in view of the contrary proof as to appellant's employment relationship and association with the veterans at the time of their applications and the priority purchases, his fairly inferable knowledge of their eligibility as veterans for such priority vehicle purchases at prices substantially less than those for such trucks as may otherwise have then been available;[4] his almost immediate acquisition of title thereto before each vehicle had ever been used by the veteran for any purpose of his own; his act in either furnishing the

2. The complaint alleged that appellant "used, or engaged in, or caused to be used, or engaged in, or entered into an agreement, combination, or conspiracy to use or engage in a fraudulent trick, scheme or device for the purpose of securing or obtaining surplus property consisting of three GMC 1942 model trucks from the United States."

3. Adair testified that he bought the truck with his own money in appellant's absence; that because the truck broke down with him on the way home, he felt he had been "gypped", and sold it to appellant just to get rid of it. As heretofore noted, however, appellant reimbursed Adair the very next day after his purchase for the exact cost of the truck, and before Adair had ever used the truck for any business purpose of his own.

4. This Court judicially knows that a shortage of trucks for civilian use existed in 1946 shortly after the end of World War II.

money for the purchase, as in the Reese transaction, or reimbursing the veteran in the exact amount of his purchase immediately upon delivery of the vehicle shortly thereafter, as in the Adair purchase; and finally, the inference that appellant either furnished the money for the Axe purchase,[5] or that at least it was never actually contemplated that Axe would make the personal use of it represented in his prior application, as evidenced by his immediate delivery of possession and subsequent transfer of title to the truck to appellant before he could use it for any purpose of his own. In view of all this testimony and inferences reasonably flowing therefrom, certainly we may not set aside the district court's findings as "clearly erroneous." Rule 52(a), Fed.Rules Civ.Proc., 28 U.S.C.A. Furthermore, from our careful review of the entire record testimony, we can conscientiously claim no "definite and firm conviction that a mistake has been committed" which would justify reversal. See United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746.

 This is not a criminal proceeding, but a statutory, civil action for liquidated damages, and the Government was not required to prove any conspiracy between appellant and the veterans to file any false applications for the priority certificates beyond a reasonable doubt, but was only required to adduce either substantial evidence of his involvement in such a conspiracy, or his inducement of the misrepresentation as a "fraudulent trick, scheme or device" to enable him to procure surplus vehicles on a priority basis to which he was not then entitled under the Act. Acknowledging our duty under the rule to view the testimony and inferences therefrom in the light most favorable to the prevailing party below, we think the proof is adequate to support the award under either theory. See United States v. Rex Trailer Co., 7 Cir., 218 F.2d 880, affirmed 350 U.S. 148, 76 S.Ct. 219; cf. Russell v. United States, 5 Cir., 222 F.2d 197. Certainly, the proof was sufficient to make out a prima facie case of appellant's involvement in each of the transactions and liability to respond civilly in liquidated damages under the statute; and this not being a criminal case, his failure either to take the stand, or show that he was unable to testify, or even to offer any excuse whatever for his failure to testify in explanation of suspicious facts and circumstances peculiarly within his knowledge, fairly warrants the inference that his testimony, if produced, would have been adverse.[6] As appropriately stated by this Court in Anderson v. United States, 185 F.2d 343, 346, a civil condemnation proceeding in which the claimant of an automobile forfeited for having been used in violation of the internal revenue laws also failed to take the stand:

"The pertinent and controlling evidence was within his knowledge and it was within his power to explain the circumstances connected with the transaction, yet he declined to testify. 'His silence may well count against him, as against any other civil litigant.' Kent v. United States, [5 Cir., 157 F.2d 1, 2]."[7]

5. There was no positive showing that appellant furnished the money for the Axe truck purchase, but it was shown that Axe purchased $4,000.00 worth of cashier's checks from a bank just before his purchase, at a time when his bank balance was not nearly so large, and appellant's balance in that same bank was well in excess of that amount. The Government insists that Axe used three of these cashier's checks, each in the amount of $500.00, to pay for his truck.

6. See Local 167, etc., v. United States, 291 U.S. 293, 298, 54 S.Ct. 396, 78 L.Ed. 804; 31 C.J.S., Evidence, § 156 d, p. 860; 20 Am.Jur., Evidence, § 190, p. 193; Vol. II Wigmore on Evidence (3rd ed.), § 289, p. 171; see also, Meier v. Commissioner, 8 Cir., 199 F.2d 392, 396, and authorities there cited.

7. "Constitutional protections against the drawing of adverse presumptions from failure to testify [apply] only to criminal cases. * * * It is utterly irrelevant to a civil proceeding such as the present one." Attorney General v. Pelletier, 240 Mass. 264, 134 N.E. 407, 423.

Again, the testimony of the two investigators, Girlinghouse and Thomason, to the extent that it was not objected to as hearsay, constituted evidence in the cause. As said by the Supreme Court in Diaz v. United States, 223 U.S. 442, 450, 32 S.Ct. 250, 252, 56 L.Ed. 500: "So, of the fact that it was hearsay, it suffices to observe that when evidence of that character is admitted without objection, it is to be considered and given its natural probative effect as if it were in law admissible." [8]

That the Government had a legitimate, proprietary interest in insuring the disposal of its surplus vehicles only to veterans on a priority basis, in accord with the announced policy and objectives of the Surplus Property Act;[9] that appellant was chargeable with knowledge of that declared policy and the prohibition against sale or transfer of a veteran's rights to non-veterans under guise of a fraudulent scheme or agency;[10] and that the Government has suffered compensable damage under the statute for appellant's having obtained such vehicles in manifest perversion of that declared policy, are all propositions which, we think, have been settled beyond our duty of further review. As the Supreme Court has most recently held in its construction of this same statute in the Rex Trailer Co. case, supra:

> "It is obvious that injury to the Government resulted from the Rex Trailer Company's fraudulent purchase of trucks. It precluded bona fide sales to veterans, decreased the number of motor vehicles available

to Government agencies, and tended to promote undesirable speculation." 350 U.S. 148, 76 S.Ct. 219, 222.[11]
The judgment is

Affirmed.

CAMERON, Circuit Judge (dissenting).

In my opinion, the allegations of the complaint were not sustained under any recognized standard of proof and the insufficient findings of the Court below were necessarily based upon hearsay, speculation, suspicion and conjecture.

It is important to understand that this is an action whose essential ingredient is the charge of fraud, and that the law sets up a different standard with respect to the quality of the proof required in such cases from that which governs in the normal civil suit. The evidence here falls short of establishing a case under any standard, but it is essential to start out with a recognition of the fact that the law presumes against fraud and in favor of honest and fair dealing. Some of the adjectives used in describing the quality of proof required are collected in 37 C.J.S., Fraud, § 114, pp. 427 et seq.:

> "However, the courts have frequently stated that fraud must be established by evidence that is clear and convincing, expressing this principle in various ways, as by saying that fraud must be clearly, distinctly, and fully proved, or that a charge of fraud must be established by evidence that is clear, clear and positive, clear and satisfactory, clear

---

8. See also, Spiller v. Atchison, T. & S. F. Ry. Co., 253 U.S. 117, 130, 40 S.Ct. 466, 64 L.Ed. 810; Rowland v. (Boyle) St. Louis & S. F. R. R. Co., 244 U.S. 106, 108, 37 S.Ct. 577, 61 L.Ed. 1022; Schlemmer v. Buffalo, Rochester and Pittsburgh Ry. Co., 205 U.S. 1, 9, 27 S.Ct. 407, 51 L.Ed. 681; and the authorities collected in footnote 14 of the opinion of Judge Learned Hand in United States v. Costello, 2 Cir., 221 F.2d 668, 678, affirmed 350 U.S. 359, 76 S.Ct. 406.

9. For a clear declaration of the Congressional policy and purpose in enactment of

the Surplus Property Act of 1944, see Title 50 U.S.C.A.Appendix, § 1611(f), (h), and (q); and Id., § 1625.

10. See, e. g., United States v. Comstock Extension Mining Co., 9 Cir., 214 F.2d 400, 402.

11. This Circuit had previously so construed the statute in United States v. Weaver, 207 F.2d 796, 798, wherein it held "There can be no doubt that the property rights of the United States were injured as a result of the acts alleged in the complaint [charging similar violations]."

and satisfactory to a reasonable certainty, clear, satisfactory, and convincing, clear, cogent, and convincing, clear, cogent, and reliable, clear, cogent, convincing, positive, and satisfactory, clear, precise, and indubitable * * * positive and definite * * * exceptionally strong * * *."

The Supreme Court went so far in one case as to suggest proof beyond a reasonable doubt.[1]

This Court has uniformly applied the general rule above stated, using, in United States v. City of Brookhaven, 1943, 134 F.2d 442, 445, the words "clear and decisive proof", and saying, in Saenz v. Kenedy, 1949, 178 F.2d 417, 419: "Fraud is never presumed and must always be proven by clear and convincing evidence."

Most conspiracy cases are criminal, but it is well to remind ourselves also that courts are disposed to require proof of a convincing nature in conspiracy cases. See e. g. Copeland v. United States, 5 Cir., 1937, 90 F.2d 78; Rent v. United States, 5 Cir., 1954, 209 F.2d 893. According to American Jurisprudence, Vol. 11, Conspiracy, Sec. 56, p. 585, the same rules of evidence are applicable in civil as in criminal cases. Under these authorities the circumstances relied upon to establish the conspiracy must be strong enough to be inconsistent with every reasonable hypothesis of innocence.

We begin an analysis of the Government's evidence by accepting a statement from the majority opinion:

"* * * the Government was not required to prove any conspiracy between appellant and the veterans to file any false applications for the priority certificates beyond a reasonable doubt, but was only required to adduce either substantial evidence of *his involvement in such a conspiracy, or his inducement of the misrepresentation* as a 'fraudulent trick, scheme or device' to enable him to procure surplus vehicles on a priority basis to which he was not then entitled under the Act." [2]

Daniel was accused of inducing three veterans, William B. Adair, Albert R. Axe, and George L. Reese, to make these false affidavits [3] in order that he might get the benefit of them. The Government produced Reese as a witness, the defendant produced Adair, and there was no substantial competent proof concerning Axe.

The Government first put on two investigators, Girlinghouse and Thomason, and essayed by them to prove the entire case as stated in the complaint: All of these transactions had taken place in

---

1. Mr. Justice Story in Prevost v. Gratz, 6 Wheat. 481, 498, 5 L.Ed. 311.

2. Emphasis here and elsewhere supplied unless otherwise noted. Of course, under the tests of proof quoted above, mere substantial evidence was not sufficient.

3. I do not belabor the point that the sworn applications were not produced, though it is clear that secondary evidence was not admissible. The witness by whom the proof was attempted knew only that 1,248 cubic feet of records of this general character were destroyed. He would not essay to testify that these particular records were not still in existence. Presumably this litigation did not, after nine years, spring full-fledged from somebody's imagination as Pallas did from the head of Jove. It would seem logical that, during that extended period of incubation, the evidence would have been nursed carefully and not destroyed.

Congress did not command that the records be destroyed. It only gave permission for their destruction if they were not needed. It is not difficult to visualize that a private litigant, essaying to proceed under like circumstances, would be met with the rule of law, "Where it appears that a party seeking to establish a fact has voluntarily destroyed a writing constituting or containing the best evidence of that fact, he cannot introduce secondary evidence thereof, especially where the suit is in his own behalf and is founded on the writing, *without first introducing evidence to explain his destruction of the writing and to repel all inference of fraudulent design arising therefrom.*" 32 C.J.S., Evidence, § 824, p. 752, and cf. Consolidated Coke Co. v. Commissioner, 3 Cir., 1934, 70 F.2d 446, 448.

1946, and these investigators did not make their investigation until 1949, and they testified in 1955, but they were permitted to tell as facts everything they had turned up in their investigation. The type of examination used to establish the Government's case may be illustrated by questions asked Mr. Girlinghouse concerning the veteran, Axe.[4] Now Mr. Girlinghouse had no personal knowledge whatever about any of the things he covered in his testimony. He was testifying from his recollection or what his report showed, and it was based entirely on information he got from Axe and from other people.[5]

These investigators were interrogated at great length in this same manner, with an abundance of leading questions, covering each of the transactions of the three veterans. It strains credulity that the Government would seek to introduce any such palpably incompetent evidence or that the Court would take up its time receiving it (more than twenty pages in the record). At all events, the evidence had no probative value and the Court below had no right to act upon it.

With respect to the Axe transaction there was no competent evidence connecting appellant with it except that, on April 9, 1946, a check was given by him to Axe for $1,139.00.[6] The check did not show what it covered or related to. The Government also showed that the State National Bank of Garland, Texas issued six cashier's checks to Axe dated March 12, 1946, four for $500 each and two for $1,000 each. They were purchased with currency, the source of which is not hinted at. The bank statement of Daniel covering several months about that time failed to show any withdrawals which might have gone to Axe in any such amount.

The Government introduced Veteran Reese, who testified that he did make application to the Government for a priority and on the certificate issued he did purchase at Camp Livingston, Louisiana, a GMC Cargo Truck, paying therefor $1,185.00. He paid for the truck by using three $500 cashier's checks made out to Daniel and endorsed by him. He had no negotiations with Daniel until they went to the window to pay for the truck, and

---

4. "Q. Now, did you investigate the sale of surplus property to Mr. Albert R. Axe, consisting of a truck? A. Yes, sir.
"Q. Did you examine his application? A. Yes, sir. * * *
"Q. Did this application to be issued a veteran's priority certificate contain a statement as to why he wanted it? A. It stated the truck was to be used in his own personal business and not for resale.
"Q. As a result of having been issued this priority certificate was he issued the priority certificate and was he the successful purchaser of a 2½ ton GMC Cargo Truck by the War Surplus Administration sale held at Camp Livingston, Louisiana March 28, 1946? A. Yes.
"Q. Did he pay $1,139.00 to the government for this truck? A. Yes.
"Q. Did you examine the document to see how he paid for this truck? A. Yes, sir. * * *
"Q. Now, did Mr. Axe keep this truck himself and use it in his business as he represented? A. No, sir, he didn't.
"Q. What did he do with it? A. He turned the truck over to Mr. Daniel.

"Q. Did Mr. Daniel pay him anything for the truck? A. Yes, sir.
"Q. How much? A. $1,139.00. * *
"Q. And Mr. Axe never used the truck for himself? A. That is correct."

5. Appellant objected to one question similar to those set out above and the objection was overruled, and later he interposed that the witness was not testifying to what he knew of his own personal knowledge, and the Court countered that the attorney could cross-examine the witness. Apparently appellant's attorney interpreted this remark and the Court's action to mean that the Court would eliminate all of the incompetent evidence and decide the case only on the competent evidence as he made no further objection. Such an interpretation would comport with procedures normally followed in hearings without a jury.

6. We are treating the checks and bank records as if they had been properly proven though sufficient proof was not made as to any of them to make them admissible in evidence if objection had been made.

Daniel then gave him the three checks and Daniel took the change. He had never had any conversation with Daniel before that time and had not mentioned to Daniel that he had made application for priority. At the time he applied for priority he did not know Daniel. Reese worked for Dallas County under Buck Frank, and Daniel also worked for Dallas County.

Reese drove the truck back to Garland and left it at the county shops and about a year later he transferred title to Daniel. He had driven to the sale in a car belonging to J. B. Carney and along with Daniel, Adair and Axe, all being employees of the county except possibly Axe. The county bought one truck. Reese had had conversation with Mr. Carney before the purchase, but had never had a conversation with Daniel. The truck remained on the county's lot where he left it for two or three months, and was there when he moved away.

The farthest reach of this proof is that, without prior negotiations, Daniel paid for this truck after it was purchased at the auction, the truck was delivered to the county lot and remained idle for several months, and a year or so later Daniel applied to Reese for a transfer. Even if resort to speculation should be had, and the conclusion should be reached that Carney must have told Daniel that Reese had a priority certificate and asked Daniel to finance the purchase, such a premise would lend no support to the conclusion that Daniel, whom Reese did not know, had induced Reese to obtain this certificate by filing a false affidavit.

Adair testified that he was, at the time, employed by Dallas County. He made an application for priority for the purchase of a truck—"I wanted to haul some gravel and make some money with a truck like the biggest part of the people were trying to do". He went to three auctions before he was able to buy one, and Daniel, representing the county, went to one of these. Adair bought a truck at Camp Swift at Austin about May 8, 1946. Daniel was not with him and did not know whether he was at the auction, and Daniel did not know that he had a certificate of preference or had ever applied for one. He paid for the truck with his own money, giving his check dated May 8, 1946 for $1,049.00. On that date he had a balance in the State National Bank of Garland of $3,447.53. He drove it home, and made this statement with regard to it:

"Well, in coming home with it it come to pieces and it was bigger and heavier than I wanted and I felt like I had been gypped and I had spent all the money I had for this particular truck and I decided I was going to get out from under it if I could."

Upon learning that Daniel might be interested in purchasing it, he went to see Daniel and sold it to him the following day for the amount he had paid for it. Daniel did not contribute to his expenses, did not know he was buying a truck, and they had never had any conversation about such a matter. He knew Daniel, but was not sure whether Daniel was then working for the county or not.

The only way by which the Court below could have reached the conclusion that Daniel conspired with Reese and Adair to induce them to apply for preference certificates in order that he might buy their trucks, was to decide that the only competent evidence introduced was false. The only two witnesses who testified on the subject were Reese and Adair and they both swore positively that they had had no conversation with Daniel and that Daniel did not know that they had applied for or obtained certificates. Certainly there was no evidence at all tending to connect Daniel with any such conspiracy with respect to Axe.

But it is not permissible that the trier of the facts reject such uncontradicted and unimpeached testimony. Certainly the Government cannot turn its back on what Reese said because it had placed him on the stand and vouched for him. The story Adair told was entirely reasonable. He had made two unsuccessful trips to purchase a truck; he made the

purchase out of his own funds which he had in the bank without having any prior conversation at all with Daniel; he was displeased with his purchase and went to the county lot where he understood trucks were being purchased and promptly made the sale. There is nothing unreasonable or incredible at all about that statement.

We rejected the right of a trial court arbitrarily to ignore such testimony in the recent case of Benton v. Blair, 5 Cir., 1956, 228 F.2d 55, 58, 59, et seq. We there reviewed the cases generally and concluded that the trial court was not at liberty to disregard such testimony " '* * * in the absence of conflicting proof or of circumstances justifying countervailing inferences * * *' ". We arrived at a like conclusion in Foran v. Commissioner, 5 Cir., 1948, 165 F.2d 705, and in Smith v. Dunn, 5 Cir., 1955, 224 F.2d 353.

The Supreme Court has furnished good guidance in such matters in Pennsylvania R. R. Co. v. Chamberlain, 1933, 288 U.S. 333, 339–340, 53 S.Ct. 391, 393, 77 L.Ed. 819:

"We, therefore, have a case belonging to that class of cases where proven facts give equal support to each of two inconsistent inferences; in which event, neither of them being established, judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other, before he is entitled to recover. * * *

" 'There being several inferences deducible from the facts which appear, and equally consistent with all those facts, the plaintiff has not maintained the proposition upon which alone he would be entitled to recover. * * * When the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof. A verdict in favor of the party bound to maintain one of those propositions against the other is necessarily wrong.' "

At most, we have here proof that Daniel put up the money to buy Reese's car without having had any dealings concerning that car until after it had been bid in. He gave a check to Axe and even if it be speculated that he bought the Axe truck the day after its purchase (if, in truth, one had been purchased) with no explanation concerning the facts or circumstances of the purchase, such a course proves nothing wrong or suspicious. He bought the Adair truck the day after its purchase and with a plausible and uncontradicted explanation showing that purchase to have been in complete good faith. That is all of the competent proof.

And let it be understood that, if the Government labored under a crippling decrepitude, as we are asked to infer, it was entirely self-imposed. It had the option to sue all of those charged with having entered into the conspiracy, and examine each of them as a witness with full right of rejection and impeachment of their testimony. Rule 43(b) F.R.C.P. If it had a case, it elected to prosecute it on crutches because it chose to make "flesh of one and fowl of another".

The majority opinion frankly bases the affirmance on two crutches without which it is clear that the judgment would not be permitted to stand: the first crutch is that the majority assumes that the Court below accepted and acted upon the hearsay evidence furnished by the two investigators; and the second crutch is that the majority assumes that the Court below was led to its decision in part, at least, by the presumption the majority conceives to be attendant upon failure of the defendant to take the stand. Neither proposition is, in my opinion, sound under the facts of this case.

To begin with, the hearsay evidence was objected to once, the objection was overruled and, under established procedures, it was not necessary to continue to make objections. But we pass that by because it is clear beyond argument

that this Court will presume that the trial Court did not consider the incompetent evidence. The general rule is thus stated in 5 C.J.S., Appeal and Error, § 1564 (e), pp. 404 et seq.:

"It will be presumed, in the absence of a showing to the contrary, that all proper evidence was considered and all improper evidence disregarded by the trial court in making its findings.

\* \* \* \* \* \*

"In general it will be presumed on appeal, where the case is tried by the court without a jury, that the court considered only proper and competent evidence in making its findings \* \* \* and it will be presumed that such [incompetent] evidence was disregarded, this rule having been applied, among other instances, to evidence of extrajudicial statements, privileged communications, parol evidence varying a writing, opinions, hearsay, carbon copies, or the legal conclusions of the pleader. \* \* \*"

This Court recognizes that rule. See Riley v. Doing, 5 Cir., 1949, 176 F.2d 449, 453–454: "We will not undertake to segregate and separately discuss the rulings of the Court on the evidence, but will assume that he based his findings of fact on only the evidence that was competent." And the Supreme Court said very much the same thing when,[7] commenting on the failure of a party to follow up certain evidence with proof necessary to give it effect, it stated: "If so, the testimony was harmless. In other words, if the testimony was not followed up by other testimony which was necessary to give it effect we may assume that the court below gave to it no value or probative

strength. It must be kept in mind that the case was tried by the court."[8]

The majority opinion clearly attributes to the purely hearsay evidence full probative status, citing Diaz v. United States, 223 U.S. 442, 450, 32 S.Ct. 250, 56 L.Ed. 500. That was a criminal case tried before a jury and the evidence under consideration was proffered by the defendant and was admitted without objection. The opinion of Judge Hand in United States v. Costello, 2 Cir., 221 F.2d 668, 678, is also relied upon. That was a case where a motion was being heard to quash an indictment because it was based upon hearsay evidence. Certainly that has no application here. It is plain that Costello had nobody present before the grand jury to object, and the entire reason behind the rejection of hearsay evidence, opportunity to cross-examine, was lacking. The other cited cases are similarly inapplicable.

Finally, the majority would affirm the lower Court because the defendant did not take the stand to testify. Certainly the Court below did not mention in its findings that it indulged any presumption arising therefrom; and this Court ought not to prop up those findings by, itself, raising the presumption. But even if it were proper so to raise it, the presumption has no validity here. Corpus Juris Secundum[9] classifies the principle upon which the majority relies as a pseudo presumption and discusses its effect in some detail, stating:[10] "Necessity for prima facie case. Where the party on whom the burden of proof rests has failed to make out a prima facie case, the absence of the adverse party, or his failure to testify, raises no unfavorable inference against him." In Stagner v. United States, 5 Cir., 1952, 197 F.2d 992, 994, this Court called attention to the

7. J. J. McCaskill Co. v. United States, 1910, 216 U.S. 504, 517, 30 S.Ct. 386, 392, 54 L.Ed. 590.

8. In State Tax Comm. v. United, etc., Co., the Supreme Court of Arizona, 1931, 39 Ariz. 331, 6 P.2d 889, 890, used this language in referring to hearsay evidence not objected to in the lower Court: "It is, however, the undoubted rule of law that, when a case is tried to the court, even though incompetent evidence be admitted without objection, the trial court may disregard, and will be presumed to have disregarded, such evidence in rendering its decision, \* \* \*"

9. 31 C.J.S., Evidence, § 118.

10. Ib. § 156(d), p. 862.

limitations of the rule in these words: "This is not to say that [defendant's] silence could supply a complete failure of proof."

In no event could this pseudo presumption be held to take the place of evidence where that already introduced does not competently make out a case. This is made plain by Professor Wigmore:[11] "The appellant whose case is a denial of the other party's affirmation has no *burden of persuading the jury*. A party may legally sit inactive, and expect the proponent to prove his own case. Therefore, until the burden of producing evidence has shifted, the opponent has no call to bring forward any evidence at all, and may go to the jury trusting solely to the weakness of the first party's evidence. Hence, though he takes a risk in so doing, yet his failure to produce evidence cannot at this stage afford any inference as to his lack of it; otherwise the first party would virtually be evading his legitimate burden. * * * Even after the proponent has made out a prima facie case, the failure of the opponent to testify to matters particularly within his knowledge does not constitute affirmative evidence of any fact. Any unfavorable inference drawn against the opponent under such circumstances 'is persuasive rather than probative'."

If the presumption invoked by the majority has any place here it would yield to the presumption indulged by the law that all men are honest and fair.[12] That presumption may be overcome only by clear, explicit and decisive proof. This record contains no such proof. It contains no competent proof at all to sustain the Government's contentions. The Government has inflicted on one of its citizens a severe fine, whatever nice language may be used in the endeavor to make it seem less offensive, and has branded him as a fraud and a cheat. I am unwilling to do this on so flimsy a showing. Therefore, I dissent.

Rehearing denied; CAMERON, Circuit Judge, dissenting.

11. 2 Wigmore, Par. 290, p. 179, supplemented by statement added to the text by 1955 pocket supplement, p. 57.