**UNITED STATES of America,**
**Appellant,**

v.

**Virginia PRIOLA, Appellee.**

**No. 17702.**

United States Court of Appeals
Fifth Circuit.

Dec. 8, 1959.

Lionel Kestenbaum, Peter H. Schiff, William A. Montgomery, Alan S. Rosenthal, Dept. of Justice, Washington, D. C., W. L. Longshore, U. S. Atty., Birmingham, Ala., George Cochran Doub, Asst. Atty. Gen., for appellant.

Winston B. McCall, William S. Pritchard, Birmingham, Ala., Pritchard, McCall & Jones, Birmingham, Ala., of counsel, for appellee.

Before RIVES, Chief Judge, and BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Involved here are questions under the False Claims Act, R.S. 3490, 5438, 31 U.S.C.A. § 231. The Government appeals from the entry of a *j. n. o. v.*, F.R.Civ.P. 50, 28 U.S.C.A., in favor of the appellee, Virginia Priola, in disregard of an adverse jury verdict. Virginia justifies the judgment on two grounds. First, there was insufficient evidence showing that she *knowingly* submitted a false claim or participated in a conspiracy to defraud. Second, the prior administrative determination by the Armed Services Board of Contract Appeals of the very same issues adversely to the Government is res judicata or estoppel by judgment.

The contract, between the Air Force and Associates,[1] was for the overhaul of 70 Hall-Scott marine engines. The claim in capsulated form is that Associates, the contractor, submitted vouchers for the reimbursable cost of spare parts at prices higher than that paid by the spare parts supplier, Superior Parts Company, a partnership, a majority of whose partners were close relatives of the partners of Associates.[2] Superior came into being to supply parts to Associates for this contract and Miller G. Williams, Sr. and his regular attorney, William S. Duke,[3] were the moving figures in its creation as the Contracting Officer well knew.

The evidence is uncontradicted that Superior was not conceived with a view of increasing profits to Associates (or its owners) or as any devious scheme to increase costs to the Government or deny it the benefit of lower costs. On the contrary, whatever the legal consequences might be vis-a-vis the policies of the

1. This was a partnership d/b/a Miller G. Williams and Associates composed of Miller G. Williams, Sr. (50%), D. D. Hagan (25%), and Virginia Priola (25%).

2. Stella Priola, sister of Virginia (16⅔%), Mary Nita Dearman, niece of D. D. Hagan (16⅔%), Miller G. Williams, Jr. and Pat Thomas Williams, minor sons of Miller G. Williams, Sr. (16⅔% each). The remaining 33⅓% was owned by Lee Lance, a surplus spare parts finder.

3. Duke executed the Superior partnership agreement as Trustee for all save Lance and all of its operations were under his actual control and direction.

False Claims Act, Superior was born of sheer necessity. The difficulty flowed from the fact that the bid proposal called for the Air Force to supply all necessary spare parts, but when, at the commencement of contract performance, it came to getting them through requisition, no parts were available. This meant that pursuant to the contract Associates had to acquire them from commercial sources as a reimbursable item. Associates was faced with the prospect of serious loss. It had bound itself to a firm contract. The parts could not be obtained through the Air Force despite strenuous efforts and extended personal conferences at Dayton Field, the Pentagon and elsewhere. But all efforts to get more than an insubstantial percentage of requirements from commercial sources were not only unavailing, but quite frustrating.[4]

One cannot read this record without the vivid impression that the situation was nearly desperate. Like manna from heaven, or so they thought, they chanced on Lance who was a professional free lance finder and broker in war surplus parts. He knew nothing of Hall-Scott engines, but after inquiry he claimed to have located sources of supply. Sensing the value of this information which he described half seriously as a "war secret," he declined to reveal the sources unless he was assured of making something out of it. After Associates agreed to protect him on this, he took Williams and Hagan on a tour from Florida to New Orleans where parts were found. Most of them were, however, still in original military packages and the dealers declined to sell except in "job lots." They declined to sell specific parts in the actual quantities needed. The parts were, then, available on an all or none basis.

Associates then sought express approval of the Contracting Officer to purchase these in job lots and bill the actual full cost of all of them to the Government. After extended conferences, the Contracting Officer, pursuant to directions, declined to do this, insisting that under the contract, the Government could and would pay only for specific parts furnished and used.

There is no real dispute that the conference originated the idea that to facilitate the mechanics of a purchase order for specific parts (which had to be approved by the Contracting Officer in advance), a separate company should be formed to be the source of supply. Likewise without a doubt, Williams, Sr. and Hagan believed, though perhaps mistakenly from a retrospective view, that the proposed partnership was completely separate and independent. However, the Contracting Officer formally approved Superior as a source of spare parts provided, the letter stated, "that there is no overlapping of financial interests of the contractor and the source of supply; and * * * that such parts will meet the government's standard, pass quality control inspection, and that the price and other factors are in the best interests of the government."

Superior was then formed. Williams, Sr. loaned Virginia's sister, Stella, her capital contribution of $1,000 as did Hagan for his adult niece. There is no possible suggestion that either Virginia or Hagan received any proceeds from Superior. Mrs. Miller G. Williams, Sr., from her own funds,[5] advanced the $2,-

---

4. The Hall-Scott motor was a World War II engine. No wartime licensee manufacturer had any stock or parts, and neither Hall-Scott nor its parent corporation would assure Associates that any substantial portion could or would be furnished.

5. Duke, the attorney, as a witness, denied that he had stated to an FBI agent that Associates deposited the $2,000 to Mrs. Williams' personal account. The FBI agent controverted this. But this was offered and treated as a prior inconsistent statement and is not proof of the fact of payment and merely goes to the credibility of Duke. See Tropical Marine Products, Inc. v. Birmingham Fire Ins. Co., 5 Cir., 1957, 247 F.2d 116, 119–120, note 8, 1957 A.M.C. 1946, 1949, 1951, note 8; Slade v. United States, 5 Cir., 1959, 267 F.2d 834; Young v. United States, 5 Cir., 1938, 97 F.2d 200, 117 A.L.R. 316; McCormick, Evidence § 39 (1954).

000 for the interest of the two minor sons. The sons did receive substantial distributions which they used in their college education.

As contemplated in the conferences, Associates sent the Contracting Officer formal letter advice that parts were available through Superior who would be "able to furnish such parts at the same price as quoted by Hall-Scott" and that it was "a partnership composed of Lee Lance and William S. Duke, Trustee." The letter concluded in most specific terms: "Request is hereby made for permission to purchase parts as needed under this contract from Superior Parts Company at the same price as quoted by Hall-Scott." It was in reply to this that the Contracting Officer gave the approval quoted above.

Virginia, although a partner in Associates, had no voice in its management. She was at most an office manager in Associates' Birmingham office. She had no authority to sign or file any vouchers, or request for payment. She never did. All she did was sign on behalf of Associates some of the purchase orders directed to Superior calling for specific parts by descriptive nomenclature and unit price in the Hall-Scott catalogue. Under the mechanics of the contract it was necessary to secure prior approval of the Contracting Officer before submission to Superior (or any other supplier). The prices indicated on the purchase orders, as well as those actually invoiced by Superior and all of those included in the vouchers in question submitted by Associates to

the Air Force, were in every instance verified by the Contracting Officer and approved as being no greater than the Hall-Scott catalogue prices.

Virginia had no connection with Superior. She knew, of course, that her sister was a partner, and Miller G. Williams, Sr. had told her it was imperative that there be no overlapping of financial interests. She knew also that her sister had received some distribution. She did not, however, know anything about the cost of the parts to Superior or whether Superior's invoice prices to Associates at Hall-Scott catalogue less a discount was proper or improper.

On April 21, 1952, the Contracting Officer, through a routine Dun and Bradstreet report, learned for the first time of the identity and relationship of the four persons for whom Duke was Trustee in Superior. He precipitated action which resulted in payment of some of the outstanding vouchers being refused. Three vouchers, however, dated and submitted subsequently during May-September 1952 were approved by him. Two others, subsequently submitted (vouchers 63 and 99) were rejected by him and were in controversy before the Armed Services Board of Contract Appeals. Of the ten vouchers sued upon, five were approved prior to the discovery of April 21, 1952, three subsequently, and two were expressly declined.

It was the contention of the Contracting Officer, rejected by the Armed Services Board of Contract Appeals,[6] and

6. As to this matter the decision of the Board stated:

"The contracting officer's conclusions are unwarranted by the evidence before us and we cannot affirm his decision that Superior is so much the appellant's *alter ego* that the latter's recovery should be limited to the former's costs as though there were no intervening agent.

"Too little attention, we think, has been given to these facts. In the negotiation of the contract the Government did represent that it had the parts in stock and would furnish them. The sum allotted to the contract did not include the cost of these parts. The appellant did requisi-

tion the parts and the Government did fail to furnish them. At that time the appellant was left with its alternative to acquire them elsewhere. It made reasonable and diligent effort, documented by this record, to obtain them from primary sources, with only partial success. They were in fact in the surplus market but still for all practical purposes unavailable to this appellant. Mr. Williams was not at home in that market and his suggestion is not denied that purchases therein could not be limited to his particular needs which were the measure of his right to reimbursement. Certainly at this point no bad faith is to be imputed to him and

reasserted below and here, that payment by Associates to Superior of amounts in excess of the actual cost of the spare parts to Superior enabled Associates (or some of its owners) to make a profit out of reimbursable items in violation of the contract. Part II(c) of the contract provided that the contractor "shall be reimbursed for the actual cost of materials, supplies and parts" that the "cost will include any delivery charges * * * but shall not include profit or administrative expenses." Likewise Part II (d) (2) of the contract provided "that the cost of said materials, supplies and fabricated parts * * * represent the actual cost to the contractor and contain no allowance for profit or handling charges." And Part II(f) bound the contractor "to the extent of its ability, [to] procure materials at the most advantageous prices available * * *."

The Government proved that the Hall-Scott prices (less discount) charged by Superior exceeded the actual cost to Superior of the specific parts, and that Superior made a substantial profit out of the procurement of parts for resale to Associates. Clearly none of it ever went to Associates, as such, or to Virginia or Hagan.[7] Williams, Sr.[8] received Superi-

or's profits only to the extent that ownership of the pro rata interest and receipt of proceeds by his minor sons is deemed to have been his as well.

On the assumption that vouchers seeking reimbursement for these "excess" costs constituted a false claim or a conspiracy to defraud, see, e. g., United States v. Grannis, 4 Cir., 1949, 172 F.2d 507, certiorari denied 337 U.S. 918, 69 S.Ct. 1160, 93 L.Ed. 1727; United States v. Weinberg, 3 Cir., 1955, 226 F.2d 161; Murray & Sorenson, Inc. v. United States, 1 Cir., 1953, 207 F.2d 119, 42 A.L.R.2d 628, we think the District Court's action in entering judgment for Virginia was correct.

The False Claims Act is confined to those persons who make or cause to be made a claim "knowing such claim to be false, fictitious, or fraudulent" or who knowingly "enters into any agreement, combination, or conspiracy to defraud the Government * * * by obtaining * * * the payment * * * of any false or fraudulent claim." The suit here is not against the partnership as an entity or to reach assets of the entity. Cf. Detrio v. United States, 5 Cir., 1959, 264 F.2d 658. The Government was therefore required to prove as to Virginia per-

---

his experience molded his future conduct. He found an expert in the surplus field who, with Mr. Duke as trustee, organized the Superior Parts Company which acquired Hall-Scott engine parts and sold them to the appellant at Hall-Scott list price. At least three of those for whom Mr. Duke was trustee were related by blood or marriage to Mr. Williams or Mr. Hagan and Mr. Duke himself was attorney for the latter in their partnership. But these facts do not taint the transaction.

"We do not decide the controverted question whether prior to July 1952, and at a time when he was approving the purchase orders issued to Superior, the contracting officer knew or should have known the identity of those for whom Mr. Duke was acting as trustee but he did know as early as 2 October 1951, and before the two companies engaged in business that Mr. Duke as trustee was partner in Superior and at the same time either a partner in the appellant company or its attorney. It is apparent that he

was then alerted to a situation that warranted his scrutiny for in approving the proposed source of supply he imposed the condition that there should be no overlapping of financial interests. We have no disposition to view of significance the single additional fact of which he claims to have had no knowledge, that there was a relationship by blood or marriage between those financially interested in the two companies."

7. The similar suit by the Government against Hagan, since deceased, was dismissed. Lance withdrew in November 1951 receiving $4,000 for his one-third interest in the partnership.

8. The suit against Williams, Sr., consolidated with the instant case for trial after transfer from the Middle District, see United States v. Williams, D.C.M.D.Ala. 1957, 162 F.Supp. 903, resulted in an order granting a new trial "for manifest error" in the charge given in the two cases.

sonally that she had this guilty knowledge [9] of a purpose on the part of Associates to cheat the Government and to obtain the payment of amounts for which, she knew, the Government was not liable under the basic contract.

 Virginia was, of course, a member of Associates. She personally filled out purchase orders which specified parts and Hall-Scott catalogue prices. She knew as well that Superior was made up of three relatives of the partners of Associates plus the parts broker Lance. But there is simply no evidence at all to indicate that she either knew or ought to have known that the prices specified on the purchase orders, repeated on Superior's invoices and thereafter (without her personal participation) included in vouchers for reimbursement, were in any way different from the actual costs incurred. She knew, of course, from having made identification endorsements of two checks in distribution of sums by Superior to her sister, that presumably profits were being made. But there is no showing as to her that she knew anything of the activities of Superior, the sources of its income, or the circumstances under or the conditions upon which the Contracting Officer gave his approval for Associates to procure parts through Superior. Even though, as contended by the Government, her failure voluntarily to testify gave rise to a permissible jury inference,[10] under the circumstances of this case it cannot make the whole case against her. The fact is, as the District Court concluded, whatever might have been an actual or imputed consciousness of the other partners, Virginia, essentially in a clerical position, under the express terms of the articles of partnership, was not shown to have had the requisite evil knowledge.

Holding as we do that the evidence was insufficient that Virginia knowingly submitted a false claim or participated in a conspiracy to defraud disposes of this case. We therefore find it unnecessary and inappropriate to pass on the second ground asserted to justify the judgment below—that the prior administrative determination of the Armed Services Board of Contract Appeals on the very same issues here involved favorably to Virginia was res judicata.

The action of the Court was correct in entering judgment for Virginia Priola.

Affirmed.

---

9. See United States v. National Wholesalers, 9 Cir., 1956, 236 F.2d 944, certiorari denied 353 U.S. 930, 77 S.Ct. 719, 1 L.Ed.2d 724; Daniel v. United States, 5 Cir., 1956, 234 F.2d 102; United States ex rel. Ostrager v. New Orleans Chapter, 5 Cir., 1942, 127 F.2d 649. Many authorities on the question of evil intent are cited and discussed in United States v. De Witt, 5 Cir., 1959, 265 F.2d 393, 401–404 (dissenting opinion), certiorari denied De Witt v. United States, 80 S.Ct. 121.

10. "When a party to a civil action fails to testify and explain facts and circumstances peculiarly within his knowledge and ability to provide, the inference is justified that the testimony would be adverse, Daniel v. United States, 5 Cir., 1956, 234 F.2d 102; Anderson v. United States, 5 Cir., 1950, 185 F.2d 343; and Kent v. United States, 5 Cir., 1946, 157 F.2d 1." United States v. Marlow, 5 Cir., 1956, 235 F.2d 366, 368. See also Local 167, International Brotherhood of Team-

sters, Chauffers, Stablemen & Helpers of America v. United States, 1934, 291 U.S. 293, 298, 54 S.Ct. 396, 78 L.Ed. 804, 809;

Stagner v. United States, 5 Cir., 1952, 197 F.2d 992.