UNITED STATES of America, Plaintiff-Appellant, Cross-Appellee,

v.

COOPERATIVE GRAIN AND SUPPLY CO. et al., Defendants-Appellees, Cross-Appellants.

Nos. 71–1651 to 71–1653, 71–1666 to 71–1668.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 13, 1972.

Decided March 15, 1973.

---

Robert C. Guenzel, Lincoln, Neb., for Cooperative Grain & Supply Co.

Ronald R. Glancz, Atty., Appellate Section, U. S. Dept. of Justice, Washington, D. C., for the United States.

Before GIBSON and LAY, Circuit Judges, and DURFEE,* United States Court of Claims Judge.

GIBSON, Circuit Judge.

This consolidated appeal is from a series of civil actions for damages and statutory penalties under the first and second grounds of the False Claims Act, 31 U.S.C. § 231,[1] and the Agricultural

---

* United States Court of Claims Judge sitting by designation.

1. Section 231 in part reads:

"Any person not in the military or naval forces of the United States, or in the militia called into or actually employed in the service of the United States, [1] who shall make or cause to be made, or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or [2] who, . . . used,

Act of 1949, 7 U.S.C. § 1425. The gravamen of the Government's complaint is that the defendants submitted false claims to the Government and obtained price support payments and other public funds that they should not have received.

The defendants are Cooperative Grain and Supply Company, a grain elevator located in Roseland, Nebraska; John Klein, Cooperative's manager, who was head of the elevator's daily operations from January 1960 until January 1966; Jerome E. Heuertz, Cooperative's bookkeeper from November 1961 until January 1966 and its manager from January 1966 through July 15, 1967; and 27 grain producers (farmers) in the vicinity of Roseland, Nebraska, who had obtained price support payments from the Government.[2] The District Court,[3] in its unpublished opinion, generally found that the grain producers, due to the submission of false but *not* fraudulent claims, were liable for the price support payment plus certain warehouse charges and interest. The District Court did not hold the producers liable for double damages or the statutory $2,000 forfeiture under the False Claims Act, since the producers did not have what the District Court deemed to be the requisite specific

intent to defraud the Government under the False Claims Act. Cooperative and John Klein, who were held to have the specific intent to defraud, were found liable for double damages with respect to each of the grain producers' individual transactions and a $2,000 forfeiture for each transaction. Jerome E. Heuertz, an employee of Cooperative, was exonerated of all liability. Cooperative, Klein,[4] and the producers were held jointly and severally liable for the single damages. The District Court exonerated one producer, Arthur H. Schiffrens, on the doctrine of *de minimis*.

We affirm the District Court with respect to the exoneration of Heuertz and Schiffrens, and also affirm the liability of Cooperative and Klein with certain "damage" modifications to be discussed. We reverse with respect to the individual producers and hold them liable under the False Claims Act.

The District Court perceived the central legal issue of this case as whether a specific intent to defraud the Government is necessary under the False Claims Act. We think the central question is whether the defendants' conduct in submitting the false claims constituted the necessary knowledge under the Act in order to affix liability.

any false bill . . . knowing the same to contain any fraudulent or fictitious statement or entry, or [3] who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim, [4] or who, having charge . . . of any money . . . used . . . in the military or naval service, who, with intent to defraud the United States or willfully to conceal such money . . . delivers or causes to be delivered, to any other person having authority to receive the same, any amount of such money . . . less than that for which he received a certificate or took a receipt, and [5] every person authorized to make or deliver any certificate . . . certifying the receipt of arms . . . so

used . . . who makes or delivers the same to any other person without a full knowledge of the truth of the facts stated therein, and with intent to defraud the United States, . . . shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; and such forfeiture and damages shall be sued for in the same suit." (numbering inserted).

2. John Klein also received price supports as a producer.

3. The Honorable Warren Urbom, District Court of Nebraska.

4. There are three Klein defendants in this case. Hereinafter, "Klein" shall refer to John Klein, Cooperative's manager.

**52**

## I. THE FACTUAL BACKGROUND

The Agricultural Act of 1949, 7 U.S.C. § 1421 et seq., directs the Secretary of Agriculture, through the Commodity Credit Cooperation (hereinafter CCC), to provide price support for certain agricultural commodities, for example corn and wheat. The purpose of the price support is to help *producers* of commodities achieve a certain parity of income with the cost of producing the commodities on which price support is made available. The parity price of any commodity is a dollar amount, computed under a statutory formula, which will give the commodity the same purchasing power in terms of goods and services bought by farmers that the commodity had in a specified base period.

If a producer chooses to place any of the commodities that he will grow under price support, he must first get a determination from certain local county committees and eventually the local CCC concerning the number of acres and amount of grain eligible for price support. Eligible grain usually is grain that will be grown or has been grown by the producer-farmer. However, if a person has a "beneficial interest" in a commodity, for example a beneficiary of a trust whose *res* is land that produces grain, that person is considered a producer and can receive price support.[5]

Price support payments are made through warehouse-stored loans, farm-stored loans, and purchase agreements.[6] A producer may decide to participate under any number, or none, of these programs, even after the CCC has determined that a certain amount of a pro-

ducer's commodity is eligible for price support. Of the 27 defendant-producers, 20 obtained solely warehouse-stored loans, three chose only farm-stored loans, one used a purchase agreement alone, two had both warehouse-stored and farm-stored loans, and one received price support under all three programs.

To obtain price support under a warehouse-stored loan, the producer first delivered his produced ("farm-grown") grain to a grain elevator, which in this case was Cooperative. The elevator had to have entered previously into the Uniform Grain Storage Agreements with the CCC. Cooperative signed these agreements on July 1, 1960, and July 1, 1966. According to the agreements, Klein as Cooperative's manager and chief of daily operations, received the producer's grain, determined the grain's grade (for example, Grade No. 1 Corn, the highest grade) and quantity, and issued a negotiable warehouse receipt to the producer. This receipt listed how the grain was delivered, i.e. truck or rail. Cooperative stored the grain for the Government until the CCC ordered delivery.[7] The Government paid for the storing, receiving, and load-out charges connected with warehousing and pledging the grain.

Each negotiable warehouse receipt was intended to represent grain of the producer's own production. The producer then took or mailed this negotiable warehouse receipt to the local CCC office in Adams County, Nebraska, pledged the receipt as security for a loan, signed a Producer's Note and Loan

---

5. 23 Fed.Reg. 5141, § 421.3138(d)(1) (1958). The quotes in this opinion to the Federal Register are quotes to regulations that were available to the producers at the local CCC office in Adams County, Nebraska. The producers usually appeared in person at this office to apply for the price support. Often these regulations were contained in documents signed by the producers, and this opinion will designate those instances.

6. 23 Fed.Reg. 5141, § 421.3137 (1958).

7. Cooperative, as its name implies, existed for the benefit of its owners, which evidently were mostly farmers of the area. Dividends were paid from the profits, which came mainly from payments for storage. Several of the defendants were, at one time or another during the alleged claims of this suit officers of Cooperative. Cooperative grew from 200 members in 1956 to 600 in 1965.

Agreement, and received a loan from the CCC. That agreement, in part, read:

"For the purpose of obtaining the loan evidenced by the producers note, the producer, with full knowledge of the provisions (*printed on the reverse side hereof*) of section 15(a) of the Commodity Credit Corporation Charter Act, by signing the note agrees to the terms and conditions contained in section 8, on the reverse side hereof, and further represents and warrants to and agrees with all holders of the note as follows:

"(a) That the pledged commodity was produced by or for him as landowner, landlord, tenant, or sharecropper on a farm located in the county and state specified above, that both he and the pledged commodity are eligible for a loan under the provisions of the Program Bulletin and that the loan shall be subject to all the provisions of such Program Bulletin."

The producer then could pay off the loan during a certain period of time and thus redeem the pledged grain, which he might do if the market price of the grain exceeded the loan price. Otherwise, the CCC would "take over" the grain. These transactions are handled through the use of negotiable warehouse receipts issued on the produced grain.

A producer could decide, in addition to the other program or exclusively, to participate in a farm-stored loan. With this program, the producer signed a similar Producer's Note and Supplemental Loan Agreement, with the similar clauses concerning production that were quoted above in relation to the warehouse-stored loan. The producer then would store the grain directly on his farm after a CCC representative had physically inspected the grain and recorded the quantity, quality, and grade of the grain. The representative would post a notice on the side of the producer's grain storage building, which notified all persons that the grain "under seal" was pledged as security to the CCC. The farmer received payments each year from the Government, known as "reseal payments," for the storage costs of the grain and could renew the storage agreement each year with the CCC. At the time that the grain was put under seal, the CCC made a loan to the producer taking a chattel mortgage on the stored grain. The loan, as with the warehouse-stored loan, represented payment for the commodity at the price support rate. Shortly before the grain was due to be delivered to the CCC, a Commodity Delivery Notice was sent to each producer, which required the producer to certify that "no commodity has been added to or substituted for the commodity as described in the chattel mortgage." If the farmer-producer chose to deliver his grain to the CCC instead of paying off the loan, he would remove the grain from under seal and truck it to Cooperative.

The defendant-producers received price support through purchase agreements. The producer, under this method, would deliver his grain to Cooperative, receive a negotiable warehouse receipt (the same receipt as with the warehouse-stored loan), take this receipt to the CCC, sign a Purchase Agreement Settlement containing representations that the delivered grain was produced by him, and receive payment from the CCC at the price support rate. Of course, the producer would utilize this method only if the price support payment for his commodity was higher than the present market value.

The gist of the Government's false claim action is that the individual producers delivered grain under these programs and received illegal price support and other payments. A short background history of Cooperative's business illustrates the method used in circumventing the Government's farm program of price support.

In 1961, Klein was the manager of Cooperative's Roseland elevator. At that time, Cooperative was storing grain owned by Cooperative, individual producers, and the CCC. There also was

stored grain that was pledged to the CCC. In the first part of 1961, at the same time the membership of Cooperative was steadily growing, a new annex was added to the Roseland elevator. Within 30 days after the annex was filled with grain for the first time, several of the bins began to overheat due to difficulties with an automatic "hot spot" detector. The grain in those bins in the new annex, particularly the corn, was susceptible to cracking when overheated. Cracked grain lowered the grade and the value of the commodity. Cooperative had an obligation to the CCC and individual producers to maintain the grain at the same quality and grade as it was when it was delivered. Klein, as required by the signed agreements with CCC, notified the CCC of the cracked grain, and the CCC eventually lowered the grade of about 300,000 bushels of Cooperative's grain from No. 2 to No. 3 or 4. Also, during June 1961, the CCC ordered Cooperative to ship out 142,000 bushels of sample grade corn, a very low grade of corn, and suspended all government payments to Cooperative until it complied. Klein testified that he asked the CCC whether Cooperative could buy the grain. The CCC notified Klein that this was possible, and, according to Klein, Cooperative bought the grain and "sold it to—well all of it went to truckers around Denver, Colorado." From January 1962 through March 1962, the CCC received from Cooperative about 73,500 bushels of grain, which was lower in "grade" than had been originally placed under storage.

Beginning around December 12, 1961, and through about July 29, 1963, Klein began advising the defendant-producers that they could buy the grain to be placed under price support from Cooperative, rather than delivering produced grain to Cooperative. For example, of the grain that John Horton, one of the defendant-producers, placed under price

support, 86 per cent was actually produced by him and 14 per cent was purchased from Cooperative.[8]

Klein testified that he knew that the grain had to be produced by the farmers before it could be eligible for price support. The producers, for the most part, testified that they relied on Klein, who told them that purchased grain could be substituted for produced grain so long as each producer did not put more grain under price support than had been certified for him for that year. The producers testified that they did not read the government regulations or the loan contracts that informed them of the requirement that eligible grain had to be produced grain. They said that the local CCC office handled the loan applications very quickly and the regulations were not openly available to them. The producers did not testify that they attempted in any manner to ascertain whether Klein's advice of purchasing grain was possible under the price support program. However, each specifically said that he never obtained price support in any one year on a quantity of grain greater than the CCC certified "eligible grain" amount. The producer-defendants testified that they used a portion of their own produced grain for feed and purchased grain to fulfill their delivery requirements to CCC. They further said that they purchased grain from Cooperative rather than deliver their produced grain because of the saving in trucking expense and time from the farm to the elevator. Most of the producers lived within two miles of the Cooperative.

## II. THE LEGAL ISSUES

*A. Is a specific intent to defraud the Government necessary under the False Claims Act or is knowingly filing a false or fictitious claim sufficient grounds for actionable liability?* A number of cases have touched on the general question

---

8. The parties stipulated to the percentages of purchased grain placed under the price support program. The percentages ranged from 2 per cent (the Schiffrens purchase agreement, the *de minimis* transaction) to 100 per cent. Of the 30 warehouse-stored loans, for example, 19 contained more than 50 per cent purchased grain.

of intent under the False Claims Act, 31 U.S.C. § 231, but this case clearly focuses on this specific issue.

Although the defendant-appellees' brief in this case is not entirely clear, the thrust of their argument is that the producers did not understand the government regulations on delivering only produced grain and, therefore, claim that they could not have had the requisite specific intent to defraud the Government. We view this lack of understanding as a lack of actual knowledge, and our task is to determine whether the defendants' conduct shows or constitutes "knowledge" or a knowing violation of the False Claims Act.

The District Court held that the defendant-producers submitted their false claims with "carelessness and foolishness in the extreme," [9] but that they did not, therefore, have the requisite specific intent to defraud the Government. Neither the District Court, nor have other court decisions, actually defined what is meant by a "specific intent to defraud the government"; but the District Court held Cooperative and Klein possessed this intent and the individual producers did not, the latter thus avoiding liability under the False Claims Act.

■ ■ Put in a broad context, this case presents an increasingly important and commonly-faced problem, namely how must a citizen act in applying for government payments and be free from possible liabilities under the False Claims Act? Obviously a party seeking public funds must bear a great measure of responsibility in advising the Government of the true and accurate factual basis of the claim. Eligibility for payments must be established by the recipi-

ent. Therefore, what kind of duty is there to learn about government regulations or be informed under the False Claims Act? As the federal budget and payments to citizens grow even larger, so do these questions. Obviously a citizen cannot digest all the manifold regulations, nor can the Government adequately and individually inform each citizen about every regulation, but there is a corresponding duty to inform and be informed. Certain basic conditions must be made clear and must be observed if the law is to fulfill its intended purpose. The Government discharges its legal duty to inform by publishing the regulations in the Federal Register. It also informs interested applicants by pamphlet forms and in addition pinpoints attention to basic conditions in the contract forms. The applicant for public funds has a duty to read the regulations or be otherwise informed of the basic requirements of eligibility.

Many courts have required the existence of a specific intent to defraud the Government under the False Claims Act. Underlying the result of these decisions is an understandable concern for the careless claimant. For example, in United States v. Mead, 426 F.2d 118, 121 (9th Cir. 1970), the leading case on requiring specific intent, the Ninth Circuit said: "We cannot believe that the Congress intended to catch the hapless with the heavy penalties which may be imposed under the False Claims Act." In *Mead* the contractor-farmer was characterized as "clumsy rather than venal." The requirement of a specific intent to defraud can be seen, at least in part, as the establishment of a standard that exonerates the clumsy rather than

9. The District Court specifically held:
"From a full consideration of the evidence presented I find as a fact that none of the individual producers, except John W. Klein, intended to defraud the United States. In each instance the producer thought that he was entitled to receive the benefits which he received from purchased grain. He was mistaken in that belief and the mistake arose from a reliance on John W. Klein, the manager of the warehouse, from the producer's failure to read the particular documents which he had in his possession and signed, and from a failure to read or ask of the ASCS personnel an interpretation of the government regulations, and the documents. These failures amount *to carelessness and foolishness in the extreme*, but they do not constitute intent to defraud." (emphasis added).

venal claimant. But even in *Mead* the court found the evidence sufficient to support a false claim, but not to require such a finding.

We think a better approach would be to analyze these cases according to the issue of "knowing." The submission to the Government of a claim known to be false in a material aspect should be covered by the Act. The question here then would be whether the defendants' "clumsiness" or "carelessness and foolishness in the extreme" constitute conduct that the court can deem to create sufficient knowledge or awareness under the False Claims Act to be civilly actionable.

The Sixth Circuit has held that the "gravamen" of an action under the False Claims Act is an "intentional fraud and misrepresentation." United States v. Ueber, 299 F.2d 310, 314 (6th Cir. 1962). That view is supported by the following cases holding that a specific intent to defraud the Government is necessary under the Act: United States v. Mead, *supra*; United States v. Sawin, 243 F.Supp. 744, 745–746 (S.D.Iowa 1965); United States v. Goldberg, 158 F.Supp. 544, 548 (E.D.Pa.1958); United States v. Park Motors, 107 F.Supp. 168, 175–176 (E.D.Tenn.1952); United States v. Priola, 272 F.2d 589, 593–594 (5th Cir. 1959). *Priola* requires "guilty knowledge" of a plan to cheat the Government which appears to be actually *criminal* knowledge or mens rea.

The Government here contends that a specific intent to defraud the Government is not necessary under the Act and points out that only the third and fifth clauses of the Act require the element of fraud. Therefore, the specific intent to defraud the Government, as an absolute rather than alternative element, is not applicable to the remaining clauses of the Act. The Government specifically argues that "knowing such a claim to be false, fictitious, *or* fraudulent" creates alternative grounds of liability, that the disjunctive "or" means that fraud is only one theory of recovery, and that a person could knowingly file a false claim

without fraudulently intending to "cheat the government." This argument has judicial support. In Fleming v. United States, 336 F.2d 475, 479 (10th Cir. 1964), the Tenth Circuit held:

"Only the third and fifth of such eventualities contains the element of fraud or intent to defraud as an absolute, rather than an alternative element. Had Congress intended to incorporate fraud or intent to defraud into each portion of the Act, it is unlikely that it would have done so expressly in two portions and not in the remaining portions."

Other courts agree that a specific intent to defraud need not be proven; the knowing submission of a false claim is sufficient. Acme Process Equipment v. United States, 347 F.2d 509, 527 n. 26, 171 Ct.Cl. 324 (1965), rev'd on other ground, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966), rehearing denied, 385 U.S. 1032, 87 S.Ct. 738, 17 L.Ed.2d 680 (1967); United States v. Fox Lake State Bank, 225 F.Supp. 723, 724–725 (N.D.Ill.1963); United States v. Fox Lake State Bank, 240 F.Supp. 720 (N.D.Ill.1965), rev'd on other grounds, 366 F.2d 962 (7th Cir. 1966); United States v. Eagle Beef Cloth Co., 235 F.Supp. 491, 492 (E.D.N.Y.1964); United States v. Toepleman, 141 F.Supp. 677, 682–684 (E.D.N.C.1956), rev'd in part on other grounds sub nom, United States v. McNinch, 242 F.2d 359 (4th Cir. 1957), United States v. McNinch, 356 U.S. 595, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958).

Although we agree with the conclusion that a specific intent is not necessary under the first and second grounds of the False Claims Act, we do not accept the statutory argument of the Government on its face. First, we think that there is arguable support for the Ninth Circuit's following statement:

"[T]he government's position rests upon a shaky foundation of semantic distinctions. The juxtaposition of the three adjectives 'false, fictitious, or fraudulent' probably resulted from a draftmen's desire to encompass the

varying ways in which fraud is defined." United States v. Mead, *supra* at 122–123.

However, on the whole, the Ninth Circuit's view is untenable to us for several reasons. First, the title of the Act itself is "Liability of persons making false claims." Second, delving behind the language of the Act itself provides no definite support for requiring a specific intent to defraud. What cannot be disputed is that the Act does contain the disjunctive "or," which, by normal statutory construction, means the alternative. Third, no definite legislative history supports the requirement of a specific intent. The District Court in this case said that legislative history was the "most persuasive" reason to require the specific intent. The District Court quoted the following legislative history:

"Your committee took other and further testimony at Chicago, Indianapolis, and Cincinnati in regard to the purchase of horses and mules, all leading to the same result—the government being shamefully defrauded." Reports of Committee, 2d Sess. 37th Cong., Vol. 2, 1861–62.

"MR. HOWARD. I hope the Senate will take up the bill No. 467, . . . It is a bill to prevent and punish frauds upon the government of the United States; and I am very anxious to have it acted upon.

\* \* \* \* \* \*

"MR. HOWARD. I will simply say to the Senate that this bill has been prepared at the urgent solicitation of the officers who are connected with the administration of the War Department and Treasury Department. The country, as we know, has been full of complaints respecting the frauds and corruptions practiced in obtaining pay from the government during the present war; and it is said, and earnestly urged upon our attention, that further legislation is pressingly necessary to prevent this great evil; and I suppose there can be no doubt that these complaints are, in the main, well founded. From the attention I have been able to give the subject, I am satisfied that more stringent provisions are required for the purpose of punishing and preventing these frauds; and with a view to apply a more speedy and vigorous remedy in cases of this kind the present bill has been prepared." Congressional Globe, 37th Cong. 3d Sess. 952; also quoted in United States v. McNinch, 356 U.S. at n. 9, 599–600, 78 S.Ct. 950.

There has been similar language in Supreme Court cases that have referred to the Act as penalizing *fraudulent* claims. For example, the Court has said:

"Clause 2 [of the False Claims Act] includes those who do the forbidden acts for the purpose of 'aiding to obtain' payment of *fraudulent* claims." United States ex rel. Marcus v. Hess, 317 U.S. 537, 544, 63 S.Ct. 379, 384, 87 L.Ed. 443 (1942) (Mr. Justice Black for the majority court) (emphasis added).

"This is a *qui tam* action under R.S. § 3490 [a forerunner of 31 U.S.C. § 231] to recover a 'forfeiture' and 'double the amount of damages which the United States may have sustained' by reason of the same acts of *fraud* for which the respondents were previously indicted under § 37 of the Criminal Code, 18 U.S.C. § 88." *Hess, supra* at 553, 63 S.Ct. at 388 (Mr. Justice Frankfurter concurring) (emphasis added).

"That Act [the False Claims Act] was originally passed in 1863 after disclosure of widespread *fraud* against the Government during the War Between the States." Rainwater v. United States, 356 U.S. 590, 592, 78 S.Ct. 946, 948, 2 L.Ed.2d 996 (1958).

"At the same time it is equally clear that the False Claims Act was not designed to reach every kind of *fraud* practiced on the Government." *McNinch, supra* at 599, 78 S.Ct. at 953. (Mr. Justice Black for the majority court) (emphasis added).

"The statute, R.S. §§ 3490, 5438, 31 U.S.C. § 231, covers anyone who *fraudulently* 'makes or causes to be made, or presents or causes to be presented, for payment or approval . . . any claim' against the United States . . . . But when *fraudulent*, it represents an effort to 'cheat the United States.' " *McNinch, supra* at 602, 78 S.Ct. at 954 (Mr. Justice Douglas, concurring in part and dissenting in part) (emphasis added).

The legislative history cited by the District Court does not necessarily indicate that "fraud" was being used in the legal sense, which is so important to the determination of this case. Even courts struggle with the exact legal definition of fraud. But, assuming that the legislative history indicates an awareness of the difference between a false and fraudulent claim, that history does not indicate a statutory construction that the Act covers only fraudulent claims. In addition, the above Supreme Court language is not dispositive on these facts. That Court was not faced with this exact issue of specific intent, and general references to fraud or fraudulent claims should not be construed as a binding characterization of the whole Act.

■ However, the most persuasive reason for not requiring a specific intent to defraud the Government is that Act is simply couched in broader terms. The Act is remedial [10] and in plain language covers the submission of a claim known to be false. The area of disagreement is what can be considered "knowing" under the statute. The courts and the parties and the District Court in this case have framed the issue under the "specific intent to defraud" category. But that categorization does not aid analysis in this case. The real issue is what does it mean "to know" in order to impose liability.

When a person knowingly files a false claim, we would agree that his purpose most likely would be "to cheat" the Government by "lining his pockets." What does it mean to say "knowing such claim to be false?" Does a hapless claimant have the requisite knowledge? If a person is careless and foolish in the extreme does he have knowledge according to the Act? To analyze this issue in relation to the broader concept of intent does not pinpoint the narrower issue of knowledge or a knowing act.

■ The issue is further complicated because knowledge and intent are overlapping concepts and often proved by the same evidence. Knowledge is part of the larger concept of intent. Further, knowledge, or *scienter* in legal terminology, is both a part of the mens rea of criminal intent and the intent to deceive in a common law tortious misrepresentation. R. Perkins, Criminal Law 771–779 (2d Ed. 1969); Wm. Prosser, Torts 715–716 (2d Ed. 1964). Although knowledge and intent are overlapping concepts, the specific element of intent, which is *distinct* from knowledge, is the specific will to act, an element of deliberateness or wilfulness or in other words, not inadvertent or accidental. Wigmore, Evidence, § 242 at 39 (3d Ed. 1940). The specific will to act of intent is divided into two basic categories, the volitional action itself and the "ill will." The volitional action refers to the action, not accidental, of presenting a claim to the Government. "Ill will" refers to the person's state of mind, in this case, desiring to "cheat" the Government. According to the False Claims Act, the volitional action of intent is encompassed in the words, e. g. "present," "cause to be presented," and "makes, uses or causes to be made." 31 U.S.C. § 231. Of course, the "ill will" part of intent is not encompassed in any part of the Act except the word "fraudulent." Intent, therefore, includes the

10. The Supreme Court held in United States v. Hess, 317 U.S. 537, 549, 63 S.Ct. 379, 387 (1942), that "proceedings [under the False Claims Act] are remedial and impose a civil sanction."

elements of the volitional action of presenting the claim to the Government, the ill will towards the Government, and the knowledge of the action itself. Although we think that "ill will" may be inferred if the volitional action of presenting the claim and the element of knowledge of falsity (both express requirements for all grounds of liability under the Act) are proved by the Government (Fleming v. United States, 336 F.2d at 479), we do not require that an "ill will" or a specific intent are necessary elements for actionable liability under the Act. The real issue is whether the claimants *knew* they were submitting false claims.

To answer this issue of "knowledge," it is necessary to determine what "knowing" means under the False Claims Act. First of all, the False Claims Act, a civil statute according to the Code itself, has its counterpart in the criminal code.

"Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be fined not more than $10,000 or imprisoned not more than five years or both." 18 U.S.C. § 287.

"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years or both." 18 U.S.C. § 1001.

██ In defining "knowing" under 18 U.S.C. § 287, the criminal statute, the rules of "scienter" for the criminal mens rea should apply. *See Perkins, supra,* at 771–779, for a discussion of scienter. Since this case is brought as a civil action and since the discussion below concludes that the False Claims Act is civil in nature, there is no need to express a view on whether "extreme carelessness" could constitute a necessary "knowing" for a criminal conviction. It should be noted, however, that a "guilty avoidance of knowledge" and a "bona fide belief resulting from negligence" can form generally the requisite criminal scienter. However, these are rare cases, and usually actual guilty knowledge is required for scienter. *Perkins, supra* at 775, 779.

██ A necessary question now is whether "knowing" under the False Claims Act, 31 U.S.C. § 231, should be defined according to the criminal sense, which would usually hold negligence *not* to be the necessary scienter, or its common accepted meaning in everyday usage in civil and business operations. Some courts have perceived the False Claims Act as basically penal in nature, because of the requirement of a $2,000 forfeiture and double damages. *See, e. g.,* United States v. Schmidt, 204 F. Supp. 540, 543 (E.D.Wisc.1962). An old Eighth Circuit case held that the False Claims Act, though civil on its face, is actually a criminal statute. United States v. Shapleigh, 54 F. 126 (8th Cir. 1893). But, we think that "knowing" under the False Claims Act is "knowing" in a civil sense and not the guilty knowledge of the criminal mens rea. The Supreme Court has repeatedly held that the False Claims Act is remedial, not penal in nature, and is therefore a civil statute. In United States ex rel. Marcus v. Hess, *supra* at 550, 63 S.Ct. at 387, the Court said: "Quite aside from its interest as preserver of the peace, the government when spending its money has the same interest in protecting itself from fraudulent practices as it has in protecting any citizen from frauds which may be practiced upon him." Later Supreme Court cases have consistently held the False Claims Act

to be a civil statute. That question is no longer open. Rex Trailer Co. v. United States, 350 U.S. 148, 152–154, 76 S. Ct. 219, 100 L.Ed. 149 (1956); Koller v. United States, 359 U.S. 309, 79 S.Ct. 755, 3 L.Ed.2d 828 (1959) (*per curiam*); United States v. Hougham, 364 U.S. 310, 313, 81 S.Ct. 13, 5 L.Ed.2d 8 (1960).

 Since the False Claims Act is civil in nature, the definition of "knowing" should be the definition as applied in the civil action of misrepresentation. Prosser classifies misrepresentation into "the three familiar tort classifications of intent, negligence, and strict responsibility." Prosser, *supra* at 713–714. Since we have decided that a false claim, not only a fraudulent claim, is actionable under the Act, a negligent misrepresentation can constitute the necessary "knowledge." Prosser says that: "[A] representation made with a honest belief in its truth may still be negligent, because of lack of reasonable care in ascertaining the facts. . . ." *Prosser, supra* at 719. The individual producers here are a full step beyond negligent misrepresentation as they were extremely careless in substituting purchased grain for what was represented to be grain produced by them. The whole trust of the Price Support Payments Act is to aid producers of grain not purchasers.

 *B. Did the defendants' conduct constitute the necessary "knowledge" under the False Claims Act?* In this case, most of defendant-producers relied entirely on Klein, according to their testimony. Several of the producers were or had been officers of Cooperative. No producer indicated that he attempted in any way even to ask the local CCC office

about the advisability of purchasing grain from Cooperative. Government regulations required that a producer must have had a beneficial interest in a commodity in order to receive price support on that commodity. The regulations specifically provided that if a producer had any doubt as to whether his interest in the commodity met the eligibility requirements, he "should make available to the county committee all pertinent information, prior to filing an application which will permit a determination to be made by CCC as to his eligibility for price support." 23 Fed.Reg. § 421.3138(d)(1)(1958). Several producers even testified that they knew that only produced grain could be placed under price support program.[11]

 The defendants' conduct, as the District Court held, was extremely careless and foolish. That conduct is not only negligent but approaches fraud, an *intentional* misrepresentation. The intent to deceive of a fraudulent misrepresentation may include a reckless disregard for the truth or falsity of a belief. Cooper v. Schlesinger, 111 U.S. 148, 155, 4 S.Ct. 360, 28 L.Ed. 382 (1883); Prosser, *supra* at 715–716.

 The extreme carelessness in this case amounted to "knowing." In seeking public funds there is certainly an obligation on the applicant to make correct representations. This case would have been much different if the defendants at least had attempted to ask the CCC whether "purchased grain" would have been eligible for price support. However, it is incredible that the producers did not know that purchased grain was not eligible for price support. Another factor worthy of consideration

---

11. Of course, John Klein, who was a producer and the manager of Cooperative had the requisite knowledge, and our decision affirms the District Court's assessment of liability against Klein and Cooperative. Most of the defendants testified that they relied entirely on Klein's advice, while others admitted knowledge of noncompliance with the requirements of the Price Support Act. Glen Chris-

tensen testified the "transaction" was of his own doing. Richard Klein, who delivered grain with his father Matt Klein, said that it was "his idea" to purchase the grain from Cooperative. It is unclear whether William J. Hefnider and Ray A. Consbruck acted on their own or according to John Klein's advice. Our holding does not require a decision on this point.

is that only a relatively few farmer-producers attempted to bilk the Government by substituting purchased grain. A tolerant attitude towards this practice could well evade and defeat the entire price support program. The whole program is based on fair and correct disclosure of basic facts.

## III. DAMAGES

*A. In General.* The damages to be assessed in this case require, by the number of the parties involved alone, complex compilations. The case is reversed and remanded to the District Court to make findings and assess damages consistent with this decision. We think the following comments will aid the District Court in assessing damages.

The Government generally contends that it is entitled to recover damages under the False Claims Act, the provisions of the producers' contracts and government regulations, and the common law doctrine of payment by mistake.[12] Since the Government requests the same damages under the first two theories, the following discussion constructs a measure of damages allowable under the False Claims Act that is based on a claim submitted under the contracts and regulations involved in this case.

In order to provide a compilation from the hundreds of pages of data, we choose the following representative loans and the damages to be assessed.

*B. The Warehouse-stored Loan.* The Government requests that Cooperative, John Klein, and each of the producers who obtained warehouse-stored loans should be jointly and severally liable under single damages for the total amount of the loan, receiving charges, and storage charges, less the market value of the grain at maturity. The Government also requests double damages of the previous amount under the False Claims Act. 31 U.S.C. § 231, *supra*. It is un-

clear exactly how many $2,000 forfeitures, under the same statute, that the Government requests against each individual producer. At one point, it asks for a $2,000 forfeiture for each false document signed by each producer, no matter how many false documents are involved in one entire loan transaction. With this concept we cannot agree.

John Horton, who purchased 14 per cent of his corn from Cooperative on which he received price support payments, presents a typical example for a warehouse-stored loan. The Government computed Horton's single damages as follows:

| | |
|---|---|
| $2,108.70 | Total loan due at maturity |
| 149.30 | Plus storage charges on 100% of Horton's corn |
| 73.92 | Plus receiving charges on 100% of the corn |
| 2,331.92 | |
| 1,661.02 | Minus the market value of 100% of the corn (including the 14% purchased from Cooperative) |
| $ 670.90 | Total Single Damages. |

The District Court allowed the single damages of $670.90 against Horton, the individual producer, plus interest. Against Cooperative and Klein, who were held to have the specific intent to defraud the Government, the District Court assessed, in relation to Horton's claim, $1,341.80 double damages (which is $670.90 single damages doubled), a single forfeiture of $2,000, plus interest from the time of the loan payment until the date of judgment. Further, the District Court held that Horton, Cooperative, and Klein were jointly and severally liable for the amount of the single damages, the $670.90 assessed individually against Horton.

We think that the following computation should be made to arrive at the liability of the individual producer for a warehouse-stored loan. Again,

---

12. The Government urges that the doctrine of payment by mistake allows recovery of erroneous payments. Since we allow greater damages under the other theories than possible under the payment-by-mistake doctrine, we offer no opinion on the availability of this theory under the present facts.

John Horton may be used as a representative example.

| | |
|---|---|
| $2,108.70 | Total loan due at maturity |
| 1,661.02 | Minus the market value of the 100% corn delivered |
| 447.68 | |
| 10.35 | Plus "receiving charges" on purchased corn (14%) |
| 20.90 | Plus "storage charges" on purchased corn (14%) |
| 478.93 | Total single damages |
| x 2 | |
| 957.86 | Total Double Damages |
| 2,000.00 | Plus forfeiture once for each *entire* transaction |
| $2,957.86 | Total Damages against John Horton, not including interest. |

In addition, interest should be assessed against the $478.93 from the date of the loan payment to the date of judgment *and* doubled, since interest can properly be recovered as "damage" under the False Claims Act.

The damages against Cooperative and Klein are the same as Horton's liability. Therefore, each individual producer, Cooperative, and Klein are jointly and severally liable for the double damage figure, plus one forfeiture per each entire loan made, and the interest as described above.

■ An explanation of the above computations is necessary. The parties and the District Court agree that, for John Horton of course, $447.68 is the proper starting point to determine the producer's liability. We agree with this determination and proceed with our other computations according to the rationale expressed in United States v. Woodbury, 359 F.2d 370, 379 (9th Cir. 1966), which held that "[T]he measure of the government's damages would be the amount that it paid out by reason of the false statements over and above what it would have paid if the claims had been truthful." First, subtracting the $1,661.02 (the market value on the date of delivery of the entire 100 per cent delivered corn) from the $2,108.70 (the loan amount actually received by the producer, which is also the amount which a producer would have received on an entirely truthful claim) aids in achieving the *Woodbury* goal. The $447.68 remaining after the above subtraction represents damages of government payments for price support on the entire 100 per cent of Horton's corn, even though 86 per cent of Horton's corn actually had been properly produced and delivered by him. The price support on the *entire* loan should be returned to the Government for several reasons. First, a provision in the Producer's Note and Supplemental Loan Agreement, which is also contained in a government regulation, specifically calls for this result.[13] That regulation clear-

---

13. That provision reads:

"(a) The making of any fraudulent representation by a producer in the loan documents or in obtaining the loans, or the unlawful disposition of any portion of the commodity by him shall render the producer subject to criminal prosecution under Federal Law and shall render him personally liable for the amount of the loan, for any additional amounts paid to the producer on the commodity, and for any resulting expense incurred by CCC together with interest on such amounts. Any such loan shall become payable upon demand. If a producer has made any such fraudulent representation or unlawful disposition, the amount of his personal liability shall be the amount of the loan, charges, and all costs that CCC would not have incurred had it not been for the producer's fraudulent representation, or unlawful disposition, together with interest on such amounts, less the market value of the commodity on the date of delivery or removal, as determined by CCC in the case of farm-storage loans or the market value of the commodity as of the close of the market on the final date for repayment, as determined by CCC, in the case of warehouse-storage loans." General Provisions 1961 and Subsequent Crop Price Support Programs for Grains and Related Commodities, § 421.117(a); also contained in 26 Fed.Reg. 2108 (1961), which is a regulation promulgated by the Secretary of Agriculture pursuant to 7 U.S.C. § 1428. This regulation in nearly identical language has been included in all the years' regulations in questions and in all of the pertinent documents under the warehouse-stored loans, farm-stored loans, and purchase agreements.

ly calls for the $447.68 figure, the "amount of the loan" less the "market value of the commodity on the date of delivery or removal."

The Government next requests that the $73.92 receiving charges for 100 per cent of Horton's corn and $149.-30 storage charges for 100 per cent of Horton's corn should be allowed. The District Court allowed these amounts in computing the single damages of the individual producer. We hold that the Government cannot support a claim for these warehouse charges against 100 per cent of the producer's commodity. The Government should only receive damages for warehouse charges paid on the purchased grain, which we computed as $10.35 for receiving charges and $20.90 for storage charges. The Government only cites regulation § 421.117(a), *supra*, and no case support, for the position that warehouse charges are recoverable against 100 per cent of the producer's commodity. It argues that the receiving and storage charges are "additional payments" under § 421.117(a) and that "had the false representations not been made" the Government would not have made *any* warehouse payments (or for that matter any payments at all). The Government's position is extreme. The *Woodbury* test reasonably sets the measure of damages at the amount paid due to the false claim minus the amount paid had the claim been truthful. The Government should have to pay the storage and receiving charges on the 86 per cent delivered corn that had been produced by Horton. For the same reason that the Government allows the producer's claim for the market value of the *delivered* commodity, the Government should allow the payments for warehouse charges for the properly *delivered* and *produced* grain, and not request further monetary sanctions by way of disallowing proper charges. The Act provides ample congressional sanctions of double damages plus a $2,000 forfeiture.

Also, the Government cannot successfully argue that the language of § 421.-117(a) expressly provides for damages for the entire warehouse charges. The Government relies on the phrase "for any additional amounts paid to the producer on the commodity" in § 421.-117(a) to support their claim for *all* warehouse charges. "Commodity" is a key word in that phrase and could easily refer to the previous phrase in that regulation in which "commodity" refers only to the portion *unlawfully* delivered. Also, in the same paragraph of the same regulation, a further measure of damages states that a producer's personal liability is for all "charges and, costs that CCC would not have incurred had it not been for the producer's fraudulent representations or unlawful disposition. . . . " The reasonable interpretation of this clause would be the *Woodbury* test itself. Of course, the Government contends that it would not have dealt with a "fraudulent" producer at all, and therefore, any payments made to such a producer would have been payments that would not have been made. This reasoning ignores fundamental principles in computing damages.

The Government should be allowed to recover only the damages that it has actually suffered after having entered into a transaction, plus the statutory penalties. No one wants to deal with a "fraudulent" party to a contract. However, the Government has contracted with the producers, has received the benefit of the properly produced and delivered corn, and has received the benefit of the warehouse charges on the 86 per cent produced corn (in Horton's example). Second, it must be remembered that the double damages and the forfeiture allowed under the False Claims Act are further sanctions that aid in making the Government "whole." Third, this holding on the warehouse charges still broadly protects "the funds and property of the Government from fraudulent claims. . . . " Rainwater v. United States, 356 U.S. at 592, 78 S.Ct. at 948.

The single damages, therefore, for John Horton, total $478.93. The double damages are $957.86, which are

assessed pursuant to the express requirements of the False Claims Act, 31 U.S.C. § 231. In addition, that same statute requires a $2,000 forfeiture against Horton for the *entire loan transaction*. United States ex rel. Marcus v. Hess, 317 U.S. at 552, 63 S.Ct. 379; Acme Equipment Co. v. United States, 347 F.2d at 527; United States v. National Wholesalers, 236 F.2d 944, 950–51 (9th Cir. 1956); United States v. Grannis, 172 F.2d 507, 515–16 (4th Cir. 1949); United States v. Rohleder, 157 F.2d 126, 130–31 (3d Cir. 1946). If Horton had applied for two separate loans, he could be held liable for *two* forfeitures. One loan cannot support more than one forfeiture merely because several false representations were made in different documents submitted to the Government.

 Further, the damages of $2,957.86 are the joint and several liability of John Horton, as the individual producer, Cooperative, and Klein. Since Horton through his extreme carelessness, Klein through his actual knowledge, and Cooperative as the principal of Klein *caused* the payment of the false claim, each party is jointly and severally liable for the entire $2,957.86, no matter which party received certain payments from the Government. United States ex rel. Marcus v. Hess, 317 U.S. at 544–45, 63 S.Ct. 379; United States v. Veneziale, 268 F.2d 504, 505 (3d Cir. 1959).

*C. The Farm-Stored Loan.* Farm-stored loans present different data for damage compilations. Albert Trausch will be used as representative. On January 30, 1961, Trausch obtained a farm-stored loan on 7,216 bushels of his 1960 corn. The proceeds of this loan were $7,288.16. From 1961–1965, Trausch received storage payments of $4,160, known as reseal payments, from the Government for storing what the Government believed to be 7,216 bushels of corn on Trausch's farm. During the spring of 1961, Trausch discovered that 450 to 475 bushels of his corn were "all wet" and spoiled due to moisture from a leaky metal roof. During the spring of

1961, Trausch removed this "wet" corn from his storage facility. Trausch eventually received reseal payments on the 7,216 bushels of corn from 1961–1965, even though about 450 to 475 bushels of that corn were not "under seal" since the spring of 1961. On August 5, 1965, Trausch was ordered by the CCC to deliver this farm-stored corn to Cooperative. On August 17, 1965, Trausch delivered 6,957.14 bushels of this farm-stored corn to Cooperative and added to that amount 471.43 bushels of corn, which were purchased from Cooperative. Therefore, Trausch overdelivered 212.57 bushels of corn on this farm-stored loan. The Government requested the following damages against Albert Trausch:

| | |
|---|---|
| $11,883.42 | Total Loan Amount (including $435.42 overdelivery settlement and $4,160 reseal payments) |
| 8,227.14 | Minus the market value of the loan at delivery |
| 3,656.28 | . |
| 315.71 | Plus receiving charges on 100% of the corn |
| 591.03 | Plus storage charges on 100% of the corn |
| 55.17 | Plus load-out charges on 100% of corn |
| 4,618.19 | Total Single Damages |
| x 2 | Times 2 for Double Damages |
| 9,236.38 | Total Double Damages |
| 2,000.00 | Forfeiture under 31 U.S.C. § 231 |
| $11,236.38 | Total Damages, but not including interest. |

Against Cooperative and Klein, the Government requested the following damages with respect to the Albert Trausch farm-stored loan:

| | |
|---|---|
| $ 435.42 | Overdelivery settlement |
| 315.71 | Plus receiving charges on 100% of the corn |
| 591.03 | Plus storage charges on 100% of the corn |
| 55.71 | Plus load-out charges on 100% of the corn |
| 1,397.87 | Total Single Damages |
| x 2 | Times 2 for Double Damages |
| 2,795.74 | Total Double Damages |
| 2,000.00 | Forfeiture under 31 U.S.C. § 231 |
| $4,795.74 | Total Damages, but not including interest. |

 Because of factual determinations necessary at the District Court level, we cannot make an exact computation

of the damages for a farm-stored loan, as we have done with a warehouse-stored loan. However, the following rationale will aid in the determination of damages. In computing the damages against the producer under this farm-stored loan, the inclusion of damages for overdelivery is proper. Since neither party has argued in their briefs how this settlement was reached, we leave this determination to the District Court.

Although the District Court did not allow the recovery of reseal payments for single damages against the producers, we hold that the reseal payments are "additional amounts paid to the producer" under the government regulation quoted above, § 421.117(a), and are recoverable under the False Claims Act. Again, the Government requests the return of *all* reseal payments paid, for example, to Trausch, from 1961 through 1965. Trausch had approximately 6,741 bushels of corn properly under seal from 1961 through 1965, and the entire 7,216 bushels of corn properly stored before the spoilage. Trausch purchased 471.43 bushels of corn (or as the parties stipulated, about 5 per cent of the total corn delivered) to replace the 450 to 475 bushels of corn that spoiled during the spring of 1961.

For the same rationale discussed above in relation to the warehouse-stored loan and warehouse charges, we think that the *Woodbury* test requires that the measure of damages should be the difference in the amount of reseal payments that would have been made if the true amount of grain under farm-storage was reported and the amount actually paid. The quantity of grain and the time which the grain was under seal are important factors in determining the proper damages for reseal payments under the False Claims Act. For example, say a producer put 1000 bushels of wheat under storage for two years, and the Government paid the producer $30 in reseal payments for the first year. Also assume that on July 1 of the second year 100 bushels of the corn spoiled and were removed by the producer. The Government should pay the producer $30 for the reseal payments in the first year. For the second year, the Government owes the producer $15 storage payments for the first six months and $13.50 for the second six months.

Similarly, under the *Woodbury* analysis, the damages for the amount of receiving, storage, and load-out charges for the farm-stored loan should be assessed, as we have done with the warehouse-stored loan, against the illegally purchased grain *alone* and the entire charges prorated accordingly. Since Trausch actually delivered about 95 per cent of his own produced grain, no damages for these warehouse charges against this 95 per cent of the properly produced and delivered grain should be allowed.

Again, double damages against all of the above items are appropriate, and one forfeiture should be allowed per each *entire* farm-stored loan.

The following comments apply to Cooperative and Klein's liability in relation to a farm-stored loan. The Government has not requested damages, and properly so, against Cooperative and Klein for the reseal payments. In no way, can Cooperative and Klein be said to cause the payment of these claims. 31 U.S.C. § 231. The producers dealt with the Government directly for storage payments for the grain on their farms. Again, the receiving, storage, and load-out charges against Cooperative and Klein in relation to the farm-stored loan should be assessed as damages only against the illegally purchased grain. In Trausch's case, the damages should be assessed only against the 5 per cent purchased grain. Double damages and one $2,000 forfeiture pursuant to the False Claims Act are again recoverable. Interest should also be assessed. The joint and several liability for the farm-stored loan is chargeable against Trausch, Klein and Cooperative, except the damage computed against Klein and Cooperative should not include the damages for reseal payments.

*D. Other Damage Issues.* Two producers obtained price support through purchase agreements. One, Arthur H. Schiffrens, purchased grain equal to two per cent of his total delivery to Cooperative. The District Court held that such a purchase was *de minimis* and exonerated Schiffrens of all liability. We are not inclined to disturb this holding in regard to Schiffrens.

William J. Hefnider, another producer, obtained a farm-stored loan, a warehouse-stored loan, and price support through a purchase agreement. With regard to the purchase agreement, the Government claims the same damages as under the warehouse-stored loans. No other special computations, as with the reseal payments for the farm-stored loan, are present. Therefore, computation of damages for Hefnider's purchase agreement can follow our holdings in relation to the warehouse-stored loan.

The case is affirmed in part, reversed in part, and remanded to the District Court to assess damages consistent with this opinion.